UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 20-18361-BKC-MAM |
| | |
| MELANIE HOLLINGSWORTH CABOT, | Chapter 13 |
| | |
|     Debtor. | |
| _____/ | |
| | |
| SUSAN BACH, BOB MURPHY and | Adv. Case No. |
| INFOSAGE CORPORATION, a foreign | |
| corporation, | |
| | |
|     Plaintiffs, | |
| vs. | |
| | |
| MELANIE HOLLINGSWORTH CABOT, | |
| | |
|     Defendant. | |
| _____/ | |

**COMPLAINT OBJECTING TO THE DISCHARGEABILITY OF CERTAIN DEBTS**

    Susan Bach ("Bach"), Bob Murphy ("Murphy") and Infosage Corporation ("Infosage"), a foreign corporation (collectively, the "Plaintiffs"), by counsel, pursuant to 11 U.S.C. §§ 523 and 1328, bring this Complaint Objecting to the Dischargeability of Certain Debts against Melanie Hollingsworth Cabot ("Cabot" or the "Defendant" or the "Debtor"), and allege as follows:

**Jurisdiction and Venue**

    1.    This case was commenced by the filing of a voluntary Chapter 13 petition on July 31, 2020 (the "Petition Date") by the Defendant.

    2.    This is an action objecting to the dischargeability of certain debts owed to the Plaintiffs, pursuant to 11 U.S.C. §§ 523 and 1328.

    3.    This is a core proceeding and this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334 and Fed. R. Bankr. P. 7001.

    4.    Venue is proper herein pursuant to 28 U.S.C. §§ 1408 and 1409.

## Parties

5.      Susan Bach is an individual who is a resident of the Commonwealth of Massachusetts and is owed certain debt(s) as described herein.

6.      Bob Murphy is an individual who is a resident of the Commonwealth of Massachusetts and is owed a debt as described herein.

7.      Infosage Corporation is a corporation organized pursuant to the law of the Commonwealth of Massachusetts and is owed a debt as described herein.

8.      Melanie Hollingsworth Cabot is the Debtor herein.

## Cabot – Murphy Enterprise

9.      Murphy holds engineering degrees from Wentworth Institute of Technology and Arizona State University. He worked at Perini Construction Corporation for thirty-two years and rose to the position of project manager. He was involved in large development projects, including airports in Phoenix, Arizona and Las Vegas, Nevada, a casino in Las Vegas, and road designs for Boston's Big Dig project.

10.     Murphy met Cabot in 2001 through a gourmet club that Cabot organized. They became friends, and Cabot discussed the fact that she was designing a guide to Boston restaurants. After some conversation, she revealed that her true plan was to publish a parking guide for the city, similar to a guide she had seen in New York City.

11.     Murphy was enthused about the project and offered to assist Cabot. Together, they drove around the Boston area noting the location of parking lots and garages and their established rates. In the winter of 2002, Murphy joined Cabot at her ski lodge in New Hampshire. While there, Murphy inputted the data they had collected into Lotus spreadsheets on Cabot's computer. Cabot was impressed with the result and told Murphy that they should become partners

in the venture. An oral agreement to work together was reached in April, 2002.

12.    Murphy and Cabot decided that their guide should include maps showing the location of various restaurants and attractions and listing (and showing) nearby parking facilities with posted rates and hours.  Because most maps are copyright protected, Murphy identified a Florida company called Creative Force that sold map templates that could be used and revised.

13.    Murphy purchased the Creative Force maps and instructed Cabot to purchase software for her computer that would accept the map templates.  Through the first half of 2003, Murphy endeavored to revise the template maps to reflect development changes in Boston, most notably, the new Seaport District, new tunnels, and changed roadways.  He developed a series of individual maps, dividing the city into seventeen different sections.  Within each section, Murphy identified parking lots and garages with a circled number matched to an index describing the lot or garage, its capacity, hours, and posted rates.  He also included a "Useful Information" section, detailing general facts about the city, parking and tow laws, and the like.

14.    As Murphy gathered information and created drafts of the parking guide, he would forward them to Cabot for review and comment.

15.    In early August, 2003, Murphy and Cabot incorporated their venture under the name "Infosage, Inc."  Murphy was listed as president and Cabot was treasurer and clerk.  The business address was listed as Murphy's home address in Southboro, Massachusetts.   Murphy and Cabot served as the only two directors of Infosage.  They held an organizational meeting on August 3, 2003 and agreed to issue 1,000 shares of stock divided equally between them.  It was agreed that the company would develop bylaws, to include restrictions on the transfer of stock. They also agreed that costs that either one had incurred, or would incur with regard to the project, would constitute loans to the corporation, to be repaid from revenues generated by the company's

publications.

16.    In the early fall of 2003, Murphy and Cabot worked on developing their parking guide. They retained a web designer, Dmitry Yurevich, whom Cabot was familiar with through her gourmet club business, to create an Infosage website (Murphy had purchased the domain name) and contracted with Saltus Press, a printing company in Worcester, Massachusetts to print the guide.  Murphy approved the final mock-up at a meeting with the printer in Worcester on October 3, 2003. Cabot was invited to attend but declined, telling Murphy that the 8:30 a.m. meeting time was "too early in the morning."

17.    Following Murphy's approval of a mock-up of the guide in early October, 2003, Saltus printed 2,500 copies of the eighty-page Guide to Boston Parking (the "Guide").  The first printing of the Guide used the wrong sized metal binding, and the copies were returned to Saltus for rebinding.  Murphy and Cabot each advanced half of the total $10,625 printing costs.  The plan was to sell the Guide at a posted price of $16.95, through the Infosage website, processing credit cards through a credit card terminal managed by Cabot.  When a book was ordered through the website, Cabot would notify Murphy, who then shipped the book from the stock stored at his house.  Because Murphy had been primarily responsible for getting the book to publication, it was assumed that Cabot would have primary responsibility for marketing the product. Nonetheless, Murphy solicited a local barber shop in his hometown to advertise the Guide, using a countertop display that Murphy had obtained.

18.    Murphy and Cabot held a business meeting at a Boston hotel on November 27, 2003.  They reviewed various business functionalities and reviewed the corporate finances.  As of that time, the two had paid out $15,701.90 in development costs and projected $6,434.90 in future expenses.  According to a detailed financial summary prepared by Murphy, Cabot's

financial contributions were $1,615.70 less than Murphy's.

19.     During December, 2003, Murphy e-mailed Cabot five times regarding various sales issues but received no reply.  Frustrated, he left Cabot a telephone message on January 12, 2004 demanding a reply.  The following day, Cabot responded by e-mail, stating that she had not received his earlier e-mails and suspected that they had been filtered by an anti-spam program she had installed on her computer.  Cabot wrote that she had solicited views of advertising executives and several authors who endorsed the concept of a parking guide but criticized the Guide 's design and layout.  She stated that as a result of the critiques, she had ceased marketing the Guide and had a scheduled meeting with a design firm on January 14, 2004.  Cabot said that once she received an estimate of the costs and time necessary to revise the Guide, she would be in touch.

20.     Tensions between Murphy and Cabot escalated as they disagreed on a future course of action.  Cabot identified numerous errors in the book (which Murphy acknowledged). Murphy wanted to continue marketing and selling the first edition of the Guide since he had several thousand copies stored in his house.

21.     Cabot said that she had a design consultant working on a redesign and insisted that Murphy copy the book onto a compact disc that the consultant could use.  On February 14, 2004, the two met for a business meeting at a Legal Sea Foods restaurant. Cabot informed Murphy that she wanted to terminate the business, having concluded that the Guide was not marketable, and the concept of a parking guide was a bad idea, since most parking lots were "mob-owned" and frowned on publicity.

22.     Murphy objected, indicating that he wanted to keep sales efforts going. Cabot stated that she wanted to buy the company's credit card terminal because she could use it in her

gourmet food business, but Murphy refused, stating that he needed it to process sales orders.

23.     The terminal was important because it complied with new federal regulations for only imprinting partial credit card numbers.  Murphy was the source of monies ($524) for the purchase of the terminal on November 26, 2003.

24.     Relations between Murphy and Cabot following the February 14, 2004 dinner meeting were hostile. The Infosage website, under the control of Dmitry Yurevich, was taken down at Cabot's instruction, essentially gutting Infosage's ability to sell the Guide. By e-mail dated April 14, 2004, Cabot reiterated that she no longer wanted to be involved and had drawn up papers to dissolve the corporation. She instructed Murphy to send her all the financial statements, after which they could "move towards finalizing this business."

25.     By e-mail on April 24, 2004, Murphy stated that he had no intention of dissolving Infosage but that if Cabot were to withdraw from the business, they would have to determine what it would cost her to do so. Murphy objected to Cabot's instruction to Yurevich to disable the website and stated that the account could be switched over to his name so she would not be bothered with unwanted messages. He next wrote:

> You are not authorized to take any actions on behalf of the corporation that will undermine, disable, or negatively impact the accounts, agreements, or systems put in place by the corporation, or allow the equipment or protected content belonging to the corporation to be used for other purposes, or permit the same to take place, without agreement from me.  This pertains to any past or future actions.

26.     In July, 2004, Cabot resigned from Infosage.  Ten days after she submitted her written letter of resignation, Cabot received a price quote from Star Printing for an eighty-page book described as Guide to Boston Parking. The customer was listed as The Single Gourmet, Cabot's dinner club.

27.     She and Murphy met at a Fleet Bank where Cabot removed her name from the

corporate bank account.  She stated that she would instruct Yurevich to restore the Infosage website if Murphy would sign a licensing agreement that Cabot had prepared.  The licensing agreement would permit her full use of the Guide material.  Murphy refused.  He continued to demand that Cabot arrange for the website to be restored, as well as for the return of corporate property.  His communications went unanswered until September 20, 2004 when he received a telephone call from Cabot. She stated, "as soon as you sign the license agreement then we can part amicably."

28.     When Murphy spoke of his desire to obtain the credit card terminal Cabot responded, "No, we can't get into that discussion until you agree to sign the license agreement." When asked why the licensing agreement was so important, Cabot said that it was simply something she wanted for her files.  The two argued back and forth, Cabot stating that she was simply trying to recoup some of the monies she had put into the venture.

29.     The credit card terminal was of interest to both; Murphy needed it to continue with the sale of books, and Cabot stated it was an asset she could use, and its value would defray her losses in the corporation.  Cabot repeatedly directed the conversation to her need for a licensing agreement, telling Murphy, "All I am asking for [sic] one thing.  You can make your life a lot easier and can start selling tomorrow.   You sign the license agreement, and it is all yours.  If you don't, you are making life difficult for yourself."  No resolution was reached.

30.     Between August and November, 2004, Murphy sought to gain control over the Infosage website.  The original site and domain name was issued under Cabot's name and was maintained by Cabot's associate, Dmitry Yurevich.   Yurevich took direction only from Cabot and refused Murphy's requests that he restore the site.  As a result, Murphy made arrangements through an international domain name provider, ICANN, to restore the domain name,

"Infosage.com" to the corporation.  Thereafter, he hired a new web designer, Steady Vision, to access the site and redesign its content.  A new website became operational at the end of November, 2004.

31.     Unfortunately for Murphy, the Guide was then a year old and some of the information was obsolete. In December, Murphy was able to sell 14 books, and a total of 174 guides were sold in calendar year 2005. In total, 605 of the 2,500 copies of the Guide were distributed through 2008.  Based on a sales price of $16.95 per guide, Infosage (Murphy) received $7,203.75 in gross revenues.

32.     Between the fall of 2003 and her formal resignation from Infosage in July, 2004, Cabot actively pursued the parking guide venture in ways undisclosed to Murphy.  In October, she formed Parking Media, LLC as a Delaware corporation.  Cabot retained a graphic designer, Howie Green, to redesign the Guide using a digital version of the Guide.  According to Cabot, she knew the maps and other content were copyright protected and proprietary to Infosage but claimed that they were only serving as a placeholder for better maps and parking data.

33.     Acknowledging that she was not acting on behalf of Infosage, Cabot did not view her efforts as breaching any duty owed to Infosage or in competition with it because her revised product "would be better" than the Infosage Guide. Cabot also purchased an internet domain name "'WheretoPark.com."

34.     The $8 purchase price was listed as a corporate expense in Infosage's corporate minutes dated November 27, 2003.

**Cabot-Bach Enterprise**

35.     In January, 2004, Cabot called Susan Bach and suggested they meet at a local Au Bon Pain restaurant in Boston.  Bach, a 1980 graduate of Wellesley College and a 1984 graduate

of Suffolk University Law School, was married to Cabot's father for fifteen years (separating in 1995). Bach worked in television production for four years before founding Anniversary Publishing Company, a small publishing company that focused on retail and government publications.

36.     Cabot brought a copy of the Guide with her and said that she had created it with another person who was no longer interested in producing it. Cabot suggested that Bach join her in producing a better version of the Guide.

37.     Bach expressed enthusiasm for the project, saying that with the completion of the Big Dig in Boston, the timing for such a product was good. A couple of weeks later, Bach told Cabot that she had a scheduled meeting with Yankee Magazine and would be willing to gauge their interest in the Guide. At the same time, Bach asked Cabot if there was anyone else with a proprietary interest in the Guide, and Cabot responded that she had worked on the book with Bob Murphy. She stated that Murphy had a full-time job and had no desire to continue with the project so that Cabot now owned the full rights to the Guide and its contents.

38.     Bach acknowledged that she had met Murphy once at one of Cabot's dinner functions. She accepted Cabot's representation that Murphy had backed out of the project without further inquiry.

39.     Bach was intrigued by the concept of a parking guide and the prospect of an internet presence for the Guide. She informed Cabot that she had a meeting scheduled with Yankee Magazine and would be happy to pitch the Guide. Cabot responded by e-mail on February 10, 2004, writing, "This e-mail serves to authorize Susan Bach to introduce you to my publication [sic] the "Guide to Boston Parking."

40.     The e-mail also referenced that sharing the Guide was subject to "NDA and Non-

Compete Agreements to follow." Bach reported back to Cabot that Yankee was impressed with the concept of a parking guide.

41.    Using the Infosage Guide as a prototype, Bach arranged meetings to solicit input and interest from others, including an aide to a senior executive at Starbucks (no interest), the Greater Boston Visitors Bureau, and Boston.com. At the same time, Cabot was marketing the concept to others, using either the Guide or a PowerPoint presentation based on the Guide.

42.    Cabot's efforts to market the business and solicit advertisers took place both before and following her resignation from Infosage, although at all times, she continued to hold a 50% share of the corporate stock. Murphy was not informed and was unaware of these overtures, and Cabot represented at these meetings that she was acting in partnership with Bach in producing a parking guide.

43.    They also envisioned expanding revenue sources for the project, including advertising revenue from parking garages, nearby businesses and restaurants, and through an expanded internet presence. Cabot recruited Joel Gwynn, an MIT software engineer, to work on a website.  Gwynn had created an internet product called Boston Sweeper, a database to alert residents when there was scheduled street cleaning so they could remember to move their cars, which he sold to Boston.com.  Gwynn was instructed to create a website entitled "Where to Park Boston" that would be available to paid customers and would display sectional city maps, the location of parking lots and garages, parking rate information, and hours of operation. Essentially, it would be an online version of the written Guide.

44.    Moreover, as with the written guidebook, Cabot and Bach envisioned selling advertising space to local garages, lots, and businesses.  They established a rate schedule based on the size and location of an ad, and as to online advertising, a monthly rate.  As the concept

developed, they envisioned offering advertisers (particularly parking garages) the ability to have a mini-webpage on the Where to Park website where they could market their garages in real time.

45.     By October, 2004, Gwynn developed a site, the content of which was identical to the Infosage Guide (including maps) with additional space for advertisers.

46.     At the same time, Howie Green continued to redesign the written guide book, also using the Infosage material.

47.     Cabot and Bach continued to redesign the parking guide project through the summer and fall of 2004.  Cabot met with various parking garage companies while Bach engaged a public relations company to draft a press release targeted to potential advertisers.

48.     An additional solicitation mechanism was the creation of a "board of advisors" made up of prominent people in the industry, all of them friends of Bach, whose names would add some allure to the project.  Another graphic designer, Joe Whyman, was engaged to work on the design and layout of the book, using data from the Infosage Guide.

49.     Bach envisioned the guidebook to be the principal revenue producer for the venture while Cabot talked about a greater online presence with more opportunity for generating revenue.

50.     The internet at that point was still in its nascent stage and, except for Palm Pilots, was not accessible by wireless technology.  Notwithstanding their differing visions for the company, Cabot and Bach continued with their design efforts, postponing for the moment their disagreements about the corporate mission.

51.     In the summer of 2004, Cabot and Bach agreed that they were essentially working in a partnership to establish the Where to Park venture.  They did not reduce their agreement to writing until January, 2005.

52.     At that time, Bach told Cabot that she needed some security in the project beyond

a mere understanding between them.  Bach prepared, and Cabot signed, a letter agreement creating

an equal partnership going forward, operating under the names Parking Media, Inc. and Where to

Park, Inc.

53.     Neither corporation had yet been incorporated.

54.     The agreement provided that all information and material constituted trade secrets

proprietary to their company and that neither woman would compete with each other or with the

company.  At that time, Cabot and Bach hoped for a Spring, 2005 release of a new written

guidebook that they contemplated selling for just under $10 per copy.

55.     In March, they prepared a projected five-year revenue forecast that would result in

a gross profit in 2009 of $53 million (the bulk coming from "garage membership fees"), with

owner's equity totaling $39.5 million.  Also, in March, during a business lunch at the Colonnade

Hotel, Cabot intimated that there might be a "problem" with the Infosage maps and said that they

should obtain different maps for the book and website.

56.     The maps used in various Where to Park prototypes, mock-ups, and website

postings were created by Murphy.  Many of the Where to Park drafts contained neighborhood

maps that bore the language, "Copyright by Infosage, Inc." at the bottom of the map.  Additionally,

as a safeguard to misappropriation, Murphy embedded several of his maps with fictitious names,

for instance, "Murphy Square," at the corner of Milk and Water Streets in the Financial District,

as a way of identifying his creation.  Luckily for the venture, Google introduced web-based maps

that, by the summer of 2005, became open-source material, available for use to anyone without

license.

57.     Prior to that time, however, there was a scramble to seek usable maps unrelated to

Infosage.

58.     Cabot's reluctance to use the Infosage maps and other design issues delayed the roll-out of a new book.  Bach enlisted Joel Gwynn to seek out new or different sources for neighborhood maps which, once located, would require significant time and effort to incorporate them onto the website.  Gwynn expressed concern about the hours he had put into the website without compensation for his labors.  Because Cabot and Bach were operating on a shoestring budget, and recognizing the importance of Gwynn's continued work, they discussed the possibility of offering Gwynn an equity interest in their company.  Bach and Cabot informed Gwynn that they would give him some equity when the corporation was formed and Gwynn was adamant that he receive it as a condition precedent to continuing his work.

59.     In May, 2005, Cabot and Bach retained Attorney Patrick Jones of Gesmer Updegrove, LLP, to assist in forming Where to Park and Parking Media as corporations, advising them as to corporate formalities, and drafting various licensing and use agreements.

60.     In various presentations to Boston parking vendors, including Standard Parking, Fitzinn Parking Systems, and Friends of Post Office Square, Cabot and Bach had solicited interest in their prototype guide and website under the name, "Where to Park, a Division of Parking Media, Inc." even though no such corporate entity yet existed.

61.     Cabot and Bach met and communicated with Jones on a variety of issues, including Joel Gwynn's status.  Towards the end of May, Cabot informed Bach that she no longer wanted to give Gwynn an equity interest in the company, asking, "What's he going to do, sue us?" Bach objected, saying that Gwynn had become an essential member of the venture, the only engineer, and had already been promised a share in the profits for completed and future work.

62.     Cabot's treatment of Gwynn created a wedge between Cabot and Bach.  Their relationship became acrimonious as each took actions (calls and meetings with third parties)

without advising the other.

63.     Unbeknownst to Bach, Cabot gave Gwynn a check for $2,000 on June 4, 2005, endorsed (and receipted) as "payment in full" for Phase 1 work.  Gwynn refused the check.

64.     The hostile working relationship arose at a pivotal time in the corporate venture. On June 6, 2005, Bach traveled to Nashville, Tennessee for a sales pitch to senior executives at Central Parking, one of the nation's largest parking vendors.   She reported that the director of procurement responded enthusiastically to the concept of a centralized parking marketplace and did not balk at the cost of advertising; Bach stated that based on Central Parking's positive response, she would seek a similar sales meeting with Standard Parking, another national parking provider.  Bach also indicated that she told Central parking that Where to Park was looking to roll out the guide and website at the end of June.

65.     The following day, June 7, 2005, Cabot (unbeknownst to Bach) sought advice from Jones regarding Gwynn and Jason Whyman, the layout designer whose drafts of the guide were flawed. Cabot told Jones that she questioned the quality of the work performed by both men and was concerned about securing control over the website and its content.  Jones appropriately e-mailed Bach, summarizing the meeting and his recommendations.

66.      In response, Bach defended the work of both consultants and suggested that given the disagreements she had with Cabot regarding the venture's management, it might be time to "split up 'the assets' such as they are."

67.     Thereafter, Bach proposed splitting the venture into two components:  Bach would focus on aggregating parking information for Boston (and then nationally) on WheretoPark.com, and Cabot would continue developing advertising opportunities for neighborhood businesses which would be posted on the website.  Jones e-mailed both parties stating that as corporate

counsel, he could facilitate a splitting of the company so long as both sides agreed but could not represent one side over the other.

68.     On June 9, 2005, Cabot e-mailed Jones and Bach stating that she would accept Bach's proposed division of the business on certain terms and conditions, most notably that if Bach failed to meet certain milestones within fixed time periods, she would transfer 40% of her (50%) equity interest in the company to Cabot, who would continue holding her own 50% share.

69.     The fragile relationship between Cabot and Bach further ruptured when, between June 8 and 10, 2005, Bob Murphy asserted copyright claims on behalf of Infosage.  On June 9th, Gwynn e-mailed Bach a link to the Infosage.com website, asking, "What's up with this.  Did they steal our idea or did we steal theirs?"

70.     Bach communicated with Murphy by phone, e-mail, and in person over the next twenty-four hours.  Murphy informed Bach that Cabot had walked away from Infosage but did not have any right to use the Guide materials, all of which were copyrighted to the corporation.

71.     Bach e-mailed Cabot on June 9, 2005, accusing her of lying when she represented that she had the right to use Infosage's proprietary data and engaging in a conflict of interest given that she still held 50% of Infosage stock.  Bach wrote, "Melanie, I do not want to be your partner, everyone cannot be wrong . . . [and ending] . . . You may have a battle on more than one front here and I think your record on this issue is well-established."

72.     Both Bach and Cabot consulted with Attorney Jones; Cabot falsely stated in an e-mail, "None of the artwork, sketches, photographs, drawings, and related visual compositions developed by Infosage was ever used by Where to Park."

73.     After June 10, 2005, there was no semblance of a working relationship between Cabot and Bach.  On June 20, 2005, Joel Gwynn wrote to Cabot asserting that Cabot breached her

verbal agreement to give him an equity share of the company and claiming ownership interest in any computer code that he developed pending appropriate compensation.

74.    At that point, Cabot had removed the Where to Park website, but Gwynn had disabled much of its content.  At around the same time, Susan Bach formed a new company, ParkingTools.com, in collaboration with Gwynn.  Cabot was also working on a new company using Google maps.

75.    Cabot enlisted the aid of Gesmer Updegrove, LLP (Lee Gesmer, a named partner taking over the matter from Patrick Jones) to bring suit against Gwynn, Bach, and ParkingTools.com in Suffolk (Massachusetts) Superior Court.

76.    The complaint, brought in the name of Parking Media, LLC, asserted claims of breach of contract against Gwynn, intentional interference with contractual relations against Gwynn and Bach, and other violations.  In addition to damage claims, the complaint sought to enjoin Gwynn from competing with Where to Park for a year, and from using any information acquired from Where to Park.

77.    On the recommendation of Gesmer, Cabot prepared a press release for distribution to her business advisors and the media. In the release, Cabot accused Bach of sabotage and theft of software code belonging to Where to Park.

78.    Bach filed counterclaims against Cabot and Where to Park, Inc. in December, 2005. One year later, in December, 2006, Murphy, individually and on behalf of Infosage, was permitted to intervene and asserted claims against Cabot and Where to Park, Inc.

79.    The Massachusetts court proceedings were stalled when, in August, 2007, Cabot filed a bankruptcy petition in the Southern District of Florida, styled In re Melanie H. Cabot, Case No. 07-16853-BKC-PGH (the "First Bankruptcy Case").  In her schedule of assets and liabilities

in the First Bankruptcy Case, Cabot listed Susan Bach, Joel Gwynn, ParkingTools.com, Infosage, Inc., and Rob [sic] Murphy as unsecured creditors in connection with the Suffolk litigation and listed the "amount of claim" as to each as $350,000.

80.    The debts that arose in favor of Bach, Murphy and Infosage, as described in the above paragraphs, arose prior to the First Bankruptcy Case.

81.    On July 9, 2009, Cabot, through her counsel, filed the Debtor's Notice of Waiver of Discharge in the First Bankruptcy Case [ECF No. 520 in the First Bankruptcy Case], whereby Cabot waived her entitlement to a discharge, pursuant to 11 U.S.C. § 727(a)(10).

82.    On August 18, 2009, the United States Bankruptcy Court in the First Bankruptcy Case entered the Court's Order Granting Debtor's Motion to Approve Waiver of Discharge [ECF No. 526 in the First Bankruptcy Case], which provided that Cabot's discharge was denied.

83.    In the end, Bach shut down her ParkingTools.com website; and Cabot's Parking Media, LLC lawsuit was dismissed with prejudice.

## Damages Suffered by Murphy and Infosage

84.    Prior to Cabot's departure in the beginning of 2004, Infosage had established its website and printed 2,500 copies of its Guide. The obvious next step for the business was to market and sell the printed book. It was critical to the sales model that the Infosage website was operational since that was how orders for the Guide were received and paid for through credit card payments.

85.    When Cabot ordered Yurevich to disable the website, she effectively prevented Infosage from selling its product, and further prevented payments from being processed by refusing to provide Murphy with the company's credit card terminal. For all intents and purposes, Cabot shut down the company for many months until Murphy was able to gain control

over the website, redesign its content, and purchase a new terminal to process payments.

86.     Further, delays in selling the Guide in a timely manner decreased its sales value because by the time Murphy was able to get all of the pieces in place to aggressively sell the book, information in the first edition, such as hourly rates or hours of operation, had in some cases changed, and some parking sites had disappeared.

87.     Viewed in this manner, Infosage's loss is largely based on its unsold inventory of first-edition Guides (less shipping costs), which Murphy calculates to be $21,328.

88.     Damages also include the costs associated with restoring the Infosage website and processing book orders, to include $400 paid to Steady Vision, a website developer, and $513.45 for the purchase of a replacement credit card terminal.  Murphy/Infosage is further entitled to reimbursement for the value of Murphy's time for the period from February or March, 2004 until November 28, 2004, during which Murphy had to direct his efforts to restoring Infosage's website rather than actively marketing and selling the Guide.

89.     Murphy dedicated 118.58 hours to undoing the harm caused by Cabot which, at an eminently reasonable hourly value of $75, which totals $8,893.50.  Added together, damages due to Murphy and Infosage equal $31,134.95.

**Damages Suffered by Bach**

90.     Bach is entitled to damages based on Cabot's misrepresentations for the time period from January, 2004 through July 19, 2004.  During this six- and one-half-month period, Bach worked on developing and improving the parking guide concept without any ownership interest but with an expectation of some financial gain.  Whether considered under a theory of misrepresentation or quantum meruit, the result is the same; Bach contributed her legal and business acumen and spent monies to benefit the Where to Park venture, relying on Cabot's

assurances that she had the unfettered right to pursue the business and make use of Infosage

material.

91.     Bach spent 121.7 hours and had out-of-pocket expenses of $1,506.36 during this

time period.  At an hourly rate of $75, Bach is entitled to damages totaling $9,127.50 for time and

$1,506.36 for expenses during this time period.

92.     In addition, Bach has devoted 1,959.4 hours, and incurred expenses of $16,279.96,

to furthering the business between July 20, 2004 and June 9, 2005.  Bach should be entitled to an

award of damages equal to at least 33.0% of the amount requested, which would result in an award

of $48,495.15 for Bach's time, and reimbursement of $16,279.96 in expenses.

93.     Bach should also be entitled to an award of damages in the amount of $11,035.54

for Bach's time ($10,950) and expenses ($85.54) incurred between June 10-26, 2005. This time

period involved efforts by Bach to deal with revelations about the full scope of Infosage's copyright

interests, to confront Cabot and investigate her denials of Infosage's claims, and efforts to negotiate

a division of the Where to Park venture so that it could remain as a viable business.

94.     Based on the foregoing, Bach suffered damages in the amount of $86,444.51,

reflecting $68,572.65 for her time, and $17,871.86 for expenses paid.

**The Superior Court Action**

95.     On March 29, 2018, the Superior Court of the Commonwealth of Massachusetts,

in the case(s) styled *Susan Bach v. Melanie Cabot and Where to Park, Inc.* and *Infosage

Corporation and Bob Murphy v. Melanie Cabot and Where to Park, Inc.*, Case No. SUCV2005-

04042-D (the "State Court Case"), entered Findings of Fact, Rulings of Law, and Order for

Judgment After Jury Waived Trial (the "Findings of Fact"), which is attached hereto as Exhibit

"A".

96.     The Findings of Fact establish that Cabot was liable for breach of fiduciary duty and tortuous interference with advantageous business relationship, in favor of Murphy and Infosage, with damages totaling $31,134.95.

97.     The Findings of Fact also establish that Cabot was liable for breach of fiduciary duty, fraud and breach of contract, in favor of Bach, with damages totaling $86,444.51.

98.     On May 8, 2018, a Final Judgment was entered in the State Court Case, against Cabot and in favor of Murphy, Infosage and Bach, in the amounts set forth above.  A true and correct copy of the Final Judgment is attached as Exhibit "B".

**Cabot's Cyber-Harassment of Bach**

99.     Prior to the Petition Date, Cabot, in anticipation of a significant loss in the State Court Case based on the actual evidence presented against her, and her complete lack of evidence to support her false claims, established the website www.melaniecabotboston.com (the "Website").

100.    The timing and continuing escalation of Ms. Cabot's harassment though her vexatious Website are coincident with Ms. Bach's activity and Cabot's bankruptcy petition in the instant case.

101.    The main subject of the Website established by Cabot is Bach.

102.    The Website contains many false, misleading and defamatory claims relating to Bach and even her deceased parents, her marriage, her personal and professional life and information about where she lives.

103.    Cabot is infringing upon a Cox Media copyright by embedding it in her Website. Cox Media has demanded that she remove it and cease and desist from using it.  Cabot has ignored its demands.

104.    As stated above, Bach is a resident of Massachusetts and Cabot is a resident of Florida.

105.    Cabot's conduct is willful and malicious, characterized by cruelty, hostility and/or revenge.

106.    By establishing the Website, Cabot engaged in a course of conduct directed at Bach, which caused Bach substantial emotional distress and which served no legitimate purpose and is intended to intimidate Bach from participating as a creditor and further intended to subvert the instant adversary proceeding.

107.    In continuously updating the Website with additional false claims, Cabot continues her harassment of Bach.

108.    Furthermore, by establishing and continuously expanding the false content on the Website, Cabot communicated, or caused to be communicated, words, images, or language by or through the use of electronic communication(s), directed at Bach, which caused substantial emotional distress and which served no legitimate purpose and intimidate Bach from participating in the bankruptcy process.

### Count 1 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(2)(A)) (As to Murphy and Infosage)

109.    The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

110.    Cabot made false representations to Murphy and Infosage, with the intent to deceive Murphy and Infosage.

111.    Cabot knew or should have known that the representations were false at the time they were made.

112.    Murphy and Infosage relied on the misrepresentations.

113.    Such reliance was justified given the circumstances.

114.    Murphy and Infosage sustained a loss as a result of the misrepresentation(s), as detailed above.

WHEREFORE, Murphy and Infosage request that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Murphy and Infosage, in the principal amount of $31,134.95, plus interest totaling $55,541.34 (as detailed in Claim No. 6-1), is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 1328(a)(2); and (b) granting such other and further relief as the Court deems just and proper.

### Count 2 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(4)) (As to Murphy and Infosage)

115.    The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

116.    The debt owed by Cabot to Murphy and Infosage was incurred due to Cabot's fraud or defalcation while acting in a fiduciary capacity.

117.    Murphy and Infosage sustained a loss as a result of such fraud or defalcation while acting in a fiduciary capacity.

WHEREFORE, Murphy and Infosage request that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Murphy and Infosage, in the principal amount of $31,134.95, plus interest totaling $55,541.34 (as detailed in Claim No. 6-1), is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 1328(a)(2); and (b) granting such other and further relief as the Court deems just and proper.

### Count 3 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(2)(A)) (As to Bach)

118.    The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

119.    Cabot made false representations to Bach, with the intent to deceive Bach.

120.    Cabot knew or should have known that the representations were false at the time they were made.

121.    Bach relied on the misrepresentations.

122.    Such reliance was justified given the circumstances.

123.    Bach sustained a loss as a result of the misrepresentation(s), as detailed above.

WHEREFORE, Bach requests that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Bach, in the principal amount of $86,444.51, plus interest totaling $154,207.52 (as detailed in Claim No. 7-1), is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 1328(a)(2); and (b) granting such other and further relief as the Court deems just and proper.

### Count 4 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(2)(B)) (As to Bach)

124.    The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

125.    The Cabot/Bach Letter of Agreement contained materially false statements regarding Cabot's supposed ownership of Infosage's copyrighted content, which Cabot falsely restated in an e-mail to their company counsel.

126.    These statements were statements made in writing that were materially false, respecting Cabot's financial condition.

127.    Bach reasonably relied on such statements.

128.    Such reliance was justified given the circumstances.

129.    Cabot made such statements with the intent to deceive.

130.    Bach sustained a loss as a result of such statements, as detailed above.

WHEREFORE, Bach requests that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Bach, in the principal amount of $86,444.51, plus interest totaling $154,207.52 (as detailed in Claim No. 7-1), is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B) and 1328(a)(2); and (b) granting such other and further relief as the Court deems just and proper.

### Count 5 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(4)) (As to Bach)

131.   The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

132.   The debt owed by Cabot to Bach was incurred due to Cabot's fraud or defalcation while acting in a fiduciary capacity.

133.   Bach sustained a loss as a result of such fraud or defalcation while acting in a fiduciary capacity.

WHEREFORE, Bach requests that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Bach, in the principal amount of $86,444.51, plus interest totaling $154,207.52 (as detailed in Claim No. 7-1), is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 1328(a)(2); and (b) granting such other and further relief as the Court deems just and proper.

### Count 6 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(6)) (As to Bach)

134.   The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

135.   The actions referenced above in establishing and continuously updating the Website were intentional and done with the intent to harm Bach.

136.   The actions referenced above in establishing the Website caused economic,

emotional and physical damage to Bach, in an amount to be determined at trial.

137.    Such injury(ies) were the proximate result of Cabot's establishment of the Website.

138.    As a result, the debt owing to Bach relating to the Website is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6), which is applicable herein through 11 U.S.C. § 1328(c) (in the event that Cabot seeks the entry of a discharge pursuant to 11 U.S.C. § 1328(b)).

WHEREFORE, Bach requests that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Bach, relating to the Website, in an amount to be determined at trial, is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(6) and 1328(c)(2); and (b) granting such other and further relief as the Court deems just and proper.

## Count 7 – Objection to the Dischargeability of a Debt (11 U.S.C. § 523(a)(10))
## (As to Bach, Murphy and Infosage)

139.    The Plaintiffs reallege all of the allegations set forth in each of the paragraphs above.

140.    The debts owing to Bach, Murphy and Infosage were and/or could have been listed or scheduled by Cabot in the First Bankruptcy Case.

141.    As stated above, Cabot waived her discharge in the First Bankruptcy Case, and her discharge was therefore denied.

142.    As a result, the debts owing to Bach, Murphy and Infosage are non-dischargeable pursuant to 11 U.S.C. § 523(a)(10), which is applicable herein through 11 U.S.C. § 1328(c) (in the event that Cabot seeks the entry of a discharge pursuant to 11 U.S.C. § 1328(b)).

WHEREFORE, Bach, Murphy and Infosage request that this Court enter judgment against Cabot: (a) determining that the debt owed by Cabot to Bach, Murphy and Infosage, as referenced above, are non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(10) and 1328(c)(2); and (b) granting such other and further relief as the Court deems just and proper.

### Reservation of Rights

Upon completion of their investigation and discovery, the Plaintiffs reserve the right to amend this Complaint to assert any additional claims for relief against Cabot as may be warranted under the circumstances and as permitted by law.

Dated: December 18, 2020

LEIDERMAN SHELOMITH
ALEXANDER + SOMODEVILLA, PLLC
Counsel for the Plaintiffs
2699 Stirling Road, Suite C401
Ft. Lauderdale, Florida 33312
Telephone: (954) 920-5355
Facsimile: (954) 920-5371

By:_____/s/_____
ZACH B. SHELOMITH
Florida Bar No. 0122548
zbs@lsaslaw.com

*Noab₃*

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**                              **SUPERIOR COURT**
                                              **SUCV2005-04042-D**


**SUSAN BACH,**
Plaintiff,

**vs.**

**MELANIE CABOT & WHERE TO PARK, INC.,**
Defendants

_____

**INFOSAGE CORPORATION & BOB MURPHY,**
Plaintiffs,

**vs.**

**MELANIE CABOT & WHERE TO PARK, INC.,**
Defendants

_____

## FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT AFTER JURY WAIVED TRIAL

These cases arise out of failed business ventures initiated by Melanie Cabot ("Cabot"). In the first case, Susan Bach ("Bach") brought suit (by counterclaims) against Cabot and Where To Park, Inc. for breach of fiduciary duty (Count One), fraud (Count Two), breach of contract (Count Three), defamation (Count Four), and violation of Chapter 93A (Count Five), all arising out of a failed business venture. In the second case, brought by way of a complaint in intervention, Infosage Corporation ("Infosage") and Bob Murphy ("Murphy") sued Cabot and Where to Park, Inc. for breach of fiduciary duty (Counts One and Two), unfair competition

Exhibit "A"

(Infosage v. Cabot in Count Three), violation of Chapter 93A (Infosage v. Cabot in Count

Seven), and tortuous interference with advantageous business relations (Infosage v. Cabot in

Count Six).[1]

After an extended and contentious period of pretrial proceedings, the case was heard as a

jury-waived trial over five days in July, 2015.  The three principals, Bach, Murphy, and Cabot,

testified, and a total of 136 exhibits were received into evidence.  At the close of the evidence

and after receiving post-trial proposed findings and rulings, this Court took the matter under

advisement.

## FINDINGS OF FACT

The Court makes the following findings of fact based on the credible evidence presented

during trial.  I credit the fact testimony of Bob Murphy in its entirety, finding it to be truthful and

straightforward.  I credit the testimony of Susan Bach and Melanie Cabot to the extent noted

herein, usually where their testimony is corroborated by a trial exhibit that was

contemporaneously generated at the time of the events.

## CABOT - MURPHY ENTERPRISE

Bob Murphy holds engineering degrees from Wentworth Institute of Technology and

Arizona State University.  He worked at Perini Construction Corporation for thirty-two years and

rose to the position of project manager.  He was involved in large development projects,

including airports in Phoenix, Arizona and Las Vegas, Nevada, a casino in Las Vegas, and road

designs for Boston's Big Dig project.

---

[1] Count Four, seeking declaratory judgment, and Count Five, seeking imposition of a
constructive trust, were both dismissed at the time of trial.

Exhibit "A"

Murphy met Melanie Cabot in 2001 through a singles gourmet club that Cabot organized. They became friends, and Cabot discussed the fact that she was designing a guide to Boston restaurants. After some conversation, she revealed that her true plan was to publish a parking guide for the city, similar to a guide she had seen in New York City. Murphy was enthused about the project and offered to assist Cabot. Together, they drove around the Boston area noting the location of parking lots and garages and their established rates. In the winter of 2002, Murphy joined Cabot at her ski lodge in New Hampshire. While there, Murphy inputted the data they had collected into Lotus spreadsheets on Cabot's computer. Cabot was impressed with the result and told Murphy that they should become partners in the venture. An oral agreement to work together was reached in April, 2002.

Murphy and Cabot decided that their guide should include maps showing the location of various restaurants and attractions and listing (and showing) nearby parking facilities with posted rates and hours. Because most maps are copyright protected, Murphy identified a Florida company called Creative Force that sold map templates that could be used and revised. Murphy purchased the Creative Force maps and instructed Cabot to purchase software for her computer that would accept the map templates. Through the first half of 2003, Murphy endeavored to revise the template maps to reflect development changes in Boston, most notably, the new Seaport District, new tunnels, and changed roadways. He developed a series of individual maps, dividing the city into seventeen different sections. Within each section, Murphy identified parking lots and garages with a circled number matched to an index describing the lot or garage, its capacity, hours, and posted rates. He also included a "Useful Information" section, detailing general facts about the city, parking and tow laws, and the like. As Murphy gathered information

-3-

Exhibit "A"

and created drafts of the parking guide, he would forward them to Cabot for review and comment.

In early August, 2003, Murphy and Cabot incorporated their venture under the name "Infosage, Inc." Murphy was listed as president and Cabot was treasurer and clerk. The business address was listed as Murphy's home address in Southboro, Massachusetts. Murphy and Cabot served as the only two directors of Infosage. They held an organizational meeting on August 3, 2003 and agreed to issue 1,000 shares of stock divided equally between them. It was agreed that the company would develop bylaws, to include restrictions on the transfer of stock. They also agreed that costs that either one had incurred, or would incur with regard to the project, would constitute loans to the corporation, to be repaid from revenues generated by the company's publications.

In the early fall of 2003, Murphy and Cabot worked on developing their parking guide. They retained a web designer, Dmitry Yurevich, whom Cabot was familiar with through her gourmet club business, to create an Infosage website (Murphy had purchased the domain name) and contracted with Saltus Press, a printing company in Worcester, Massachusetts to print the guide. Following Murphy's approval[2] of a mock-up of the guide in early October, 2003, Saltus printed 2,500 copies of the eighty-page *Guide to Boston Parking* ("*Guide*").[3] Murphy and Cabot each advanced half of the total $10,625 printing costs. The plan was to sell the *Guide* at a posted

---

[2] Murphy approved the final mock-up at a meeting with the printer in Worcester on October 3, 2003. Cabot was invited to attend but declined, telling Murphy that the 8:30 a.m. meeting time was "too early in the morning."

[3] The first printing of the *Guide* used the wrong sized metal binding, and the copies were returned to Saltus for rebinding.

-4-

price of $16.95, through the Infosage website, processing credit cards through a credit card terminal managed by Cabot.  When a book was ordered through the website, Cabot would notify Murphy, who then shipped the book from the stock stored at his house.  Because Murphy had been primarily responsible for getting the book to publication, it was assumed that Cabot would have primary responsibility for marketing the product.  Nonetheless, Murphy solicited a local barber shop in his hometown to advertise the *Guide*, using a countertop display that Murphy had obtained.

Murphy and Cabot held a business meeting at a Boston hotel on November 27, 2003.  They reviewed various business functionalities and reviewed the corporate finances.  As of that time, the two had paid out $15,701.90 in development costs and projected $6,434.90 in future expenses.  According to a detailed financial summary prepared by Murphy, Cabot's financial contributions were $1,615.70 less than Murphy's.

During December, 2003, Murphy e-mailed Cabot five times regarding various sales issues but received no reply.  Frustrated, he left Cabot a telephone message on January 12, 2004 demanding a reply.  The following day, Cabot responded by e-mail, stating that she had not received his earlier e-mails and suspected that they had been filtered by an anti-spam program she had installed on her computer.  Cabot wrote that she had solicited views of advertising executives and several authors who endorsed the concept of a parking guide but criticized the *Guide's* design and layout.  She stated that as a result of the critiques, she had ceased marketing the *Guide* and had a scheduled meeting with a design firm on January 14, 2004.  Cabot said that once she received an estimate of the costs and time necessary to revise the *Guide*, she would be in touch.

-5-

Exhibit "A"

Tensions between Murphy and Cabot escalated as they disagreed on a future course of action. Cabot identified numerous errors in the book (which Murphy acknowledged). Murphy wanted to continue marketing and selling the first edition of the *Guide* since he had several thousand copies stored in his house. Cabot said that she had a design consultant working on a redesign and insisted that Murphy copy the book onto a compact disc that the consultant could use. On February 14, 2004, the two met for a business meeting at a Legal Sea Foods restaurant. Cabot informed Murphy that she wanted to terminate the business, having concluded that the *Guide* was not marketable and the concept of a parking guide was a bad idea, since most parking lots were "mob-owned" and frowned on publicity. Murphy objected, indicating that he wanted to keep sales efforts going. Cabot stated that she wanted to buy the company's credit card terminal because she could use it in her gourmet food business, but Murphy refused, stating that he needed it to process sales orders.[4]

Relations between Murphy and Cabot following the February 14, 2004 dinner meeting were hostile. The Infosage website, under the control of Dmitry Yurervich, was taken down at Cabot's instruction, essentially gutting Infosage's ability to sell the *Guide*. By e-mail dated April 14, 2004, Cabot reiterated that she no longer wanted to be involved and had drawn up papers to dissolve the corporation. She instructed Murphy to send her all the financial statements, after which they could "move towards finalizing this business."[5] By e-mail on April 24, 2004, Murphy stated that he had no intention of dissolving Infosage but that if Cabot were to withdraw

---

[4] The terminal was important because it complied with new federal regulations for only imprinting partial credit card numbers. According to the financial records, Murphy was the source of monies ($524) for the purchase of the terminal on November 26, 2003.

[5] Exhibit 19.

-6-

from the business, they would have to determine what it would cost her to do so.  Murphy

objected to Cabot's instruction to Yurevich to disable the website and stated that the account

could be switched over to his name so she would not be bothered with unwanted messages.  He

next wrote:

> *You are not authorized to take any actions on behalf of the corporation that*
> *will undermine, disable, or negatively impact the accounts, agreements, or*
> *systems put in place by the corporation, or allow the equipment or protected*
> *content belonging to the corporation to be used for other purposes, or*
> *permit the same to take place, without agreement from me.  This pertains to*
> *any past or future actions.*[6]

In July, 2004, Cabot resigned from Infosage.[7]  She and Murphy met at a Fleet Bank where

Cabot removed her name from the corporate bank account.  She stated that she would instruct

Yurevich to restore the Infosage website if Murphy would sign a licensing agreement that Cabot

had prepared.  The licensing agreement would permit her full use of the *Guide* material.  Murphy

refused.  He continued to demand that Cabot arrange for the website to be restored, as well as for

the return of corporate property.  His communications went unanswered until September 20,

2004 when he received a telephone call from Cabot.  She stated, "as soon as you sign the license

agreement then we can part amicably."[8]  When Murphy spoke of his desire to obtain the credit

card terminal Cabot responded, "No, we can't get into that discussion until you agree to sign the

license agreement."  When asked why the licensing agreement was so important, Cabot said that

---

[6] Exhibit 20.

[7] Ten days after she submitted her written letter of resignation, Cabot received a price quote from Star Printing for an eighty-page book described as *Guide To Boston Parking*.  The customer was listed as The Single Gourmet, Cabot's dinner club.  Exhibit 16.

[8] Exhibit 133.

-7-

Exhibit "A"

it was simply something she wanted for her files. The two argued back and forth, Cabot stating that she was simply trying to recoup some of the monies she had put into the venture. The credit card terminal was of interest to both; Murphy needed it to continue with the sale of books, and Cabot stated it was an asset she could use and its value would defray her losses in the corporation. Cabot repeatedly directed the conversation to her need for a licensing agreement, telling Murphy, "All I am asking for [sic] one thing. You can make your life a lot easier, and can start selling tomorrow. You sign the license agreement and it is all yours. If you don't, you are making life difficult for yourself."[9] No resolution was reached.

Between August and November, 2004, Murphy sought to gain control over the Infosage website. The original site and domain name was issued under Cabot's name and was maintained by Cabot's associate, Dmitry Yurevich. Yurevich took direction only from Cabot and refused Murphy's requests that he restore the site. As a result, Murphy made arrangements through an international domain name provider, ICANN, to restore the domain name, "Infosage.com" to the corporation. Thereafter, he hired a new web designer, Steady Vision, to access the site and redesign its content. A new website became operational at the end of November, 2004. Unfortunately for Murphy, the *Guide* was then a year old and some of the information was obsolete. In December, Murphy was able to sell 14 books, and a total of 174 guides were sold in calendar year 2005. In total, 605 of the 2,500 copies of the *Guide* were distributed through 2008.[10]

---

[9] *Id.*

[10] See Exhibit 11 (Book Inventory Log, showing sales of 425 books and balance distributed as promotional material or retained by Cabot). Based on a sales price of $16.95 per guide, Infosage (Murphy) received $7,203.75 in gross revenues.

-8-

Between the fall of 2003 and her formal resignation from Infosage in July, 2004, Cabot actively pursued the parking guide venture in ways undisclosed to Murphy. In October, she formed Parking Media, LLC as a Delaware corporation. Cabot retained a graphic designer, Howie Green, to redesign the *Guide* using a digital version of the *Guide*. According to Cabot, she knew the maps and other content were copyright protected and proprietary to Infosage but claimed that they were only serving as a placeholder for better maps and parking data. Acknowledging that she was not acting on behalf of Infosage, Cabot did not view her efforts as breaching any duty owed to Infosage or in competition with it because her revised product "would be better" than the Infosage *Guide*. Cabot also purchased an internet domain name "WheretoPark.com."[11]

## CABOT-BACH ENTERPRISE

In January, 2004, Cabot called Susan Bach and suggested they meet at a local Au Bon Pain restaurant in Boston. Bach, a 1980 graduate of Suffolk University Law School, had been married to Cabot's father for fifteen years (separating in 1995). Bach worked in television production for four years before founding Anniversary Publishing Company, a small publishing company that focused on retail and government publications. Cabot brought a copy of the *Guide* with her and said that she had created it with another person who was no longer interested in producing it. Cabot suggested that Bach join her in producing a better version of the *Guide*. Bach expressed enthusiasm for the project, saying that with the completion of the Big Dig in Boston, the timing for such a product was good. A couple of weeks later, Bach told Cabot that

---

[11] The $8 purchase price was listed as a corporate expense in Infosage's corporate minutes dated November 27, 2003. Exhibit 131.

Exhibit "A"

she had a scheduled meeting with Yankee Magazine and would be willing to gauge their interest in the *Guide*. At the same time, Bach asked Cabot if there was anyone else with a proprietary interest in the *Guide*, and Cabot responded that she had worked on the book with Bob Murphy. She stated that Murphy had a full-time job and had no desire to continue with the project so that Cabot now owned the full rights to the *Guide* and its contents.[12]

Bach was intrigued by the concept of a parking guide and the prospect of an internet presence for the *Guide*. She informed Cabot that she had a meeting scheduled with Yankee Magazine and would be happy to pitch the *Guide*. Cabot responded by e-mail on February 10, 2004, writing, "This e-mail serves to authorize Susan Bach to introduce you to my publication [sic] the "Guide to Boston Parking."[13] The e-mail also referenced that sharing the *Guide* was subject to "NDA and Non-Compete Agreements to follow." Bach reported back to Cabot that Yankee was impressed with the concept of a parking guide.

Using the Infosage *Guide* as a prototype, Bach arranged meetings to solicit input and interest from others, including an aide to a senior executive at Starbucks (no interest), the Greater Boston Visitors Bureau, and Boston.com. At the same time, Cabot was marketing the concept to others, using either the *Guide* or a PowerPoint presentation based on the *Guide*.[14] They also

---

[12] On cross examination, Bach acknowledged that she had met Murphy once at one of Cabot's dinner functions. She accepted Cabot's representation that Murphy had backed out of the project without further inquiry.

[13] Exhibit 26.

[14] Cabot's efforts to market the business and solicit advertisers took place both before and following her resignation from Infosage, although at all times, she continued to hold a 50% share of the corporate stock. Murphy was not informed and was unaware of these overtures, and Cabot represented at these meetings that she was acting in partnership with Bach in producing a parking guide.

-10-

envisioned expanding revenue sources for the project, including advertising revenue from parking garages, nearby businesses and restaurants, and through an expanded internet presence. Cabot recruited Joel Gwynn, an MIT software engineer, to work on a website. Gwynn had created an internet product called BostonSweeper, a database to alert residents when there was scheduled street cleaning so they could remember to move their cars, which he sold to Boston.com. Gwynn was instructed to create a website entitled "Where to Park Boston" that would be available to paid customers and would display sectional city maps, the location of parking lots and garages, parking rate information, and hours of operation. Essentially, it would be an online version of the written *Guide*. Moreover, as with the written guidebook, Cabot and Bach envisioned selling advertising space to local garages, lots, and businesses. They established a rate schedule based on the size and location of an ad, and as to online advertising, a monthly rate. As the concept developed, they envisioned offering advertisers (particularly parking garages) the ability to have a mini-webpage on the Where to Park website where they could market their garages in real time. By October, 2004, Gwynn developed a site, the content of which was identical to the Infosage *Guide* (including maps) with additional space for advertisers.[15] At the same time, Howie Green continued to redesign the written guide book, also using the Infosage material.

Cabot and Bach continued to redesign the parking guide project through the summer and fall of 2004. Cabot met with various parking garage companies while Bach engaged a public relations company to draft a press release targeted to potential advertisers. An additional solicitation mechanism was the creation of a "board of advisors" made up of prominent people in

---

[15] Exhibits 33, 34.

-11-

the industry whose names would add some allure to the project.  Another graphic designer, Joe

Whyman was engaged to work on the design and layout of the book, using data from the Infosage

*Guide*.  Bach envisioned the guidebook to be the principal revenue producer for the venture

while Cabot talked about a greater online presence with more opportunity for generating revenue.

The internet at that point was still in its nascent stage and, except for PalmPilots, was not

accessible by wireless technology.  Notwithstanding their differing visions for the company,

Cabot and Bach continued with their design efforts, postponing for the moment their

disagreements about the corporate mission.

      In the summer of 2004, Cabot and Bach agreed that they were essentially working in a

partnership to establish the Where to Park venture.  Notwithstanding Bach's background in law,

they did not reduce their agreement to writing until January, 2005.  At that time, Bach told Cabot

that she needed some security in the project beyond a mere understanding between them.  Bach

prepared, and Cabot signed, a letter agreement creating an equal partnership going forward,

operating under the names Parking Media, Inc. and Where to Park, Inc.[16]  The agreement

provided that all information and material constituted trade secrets proprietary to their company

and that neither woman would compete with each other or with the company.  At that time,

Cabot and Bach hoped for a Spring, 2005 release of a new written guidebook that they

contemplated selling for just under $10 per copy.  In March, they prepared a projected five-year

revenue forecast that would result in a gross profit in 2009 of $53 million (the bulk coming from

"garage membership fees"), with owner's equity totaling $39.5 million.  Also in March, during a

business lunch at the Colonnade Hotel, Cabot intimated that there might be a problem with the

---

    [16]  Exhibit 44.  Neither corporation had yet been incorporated.

Exhibit "A"

Infosage maps and said that they should obtain different maps for the book and website.[17]

Cabot's reluctance to use the Infosage maps and other design issues delayed the roll-out of a new book. Bach enlisted Joel Gwynn to seek out new or different sources for neighborhood maps which, once located, would require significant time and effort to incorporate them onto the website. Gwynn expressed concern about the hours he had put into the website without compensation for his labors. Because Cabot and Bach were operating on a shoestring budget, and recognizing the importance of Gwynn's continued work, they discussed the possibility of offering Gwynn an equity interest in their company. Bach informed Gwynn that they would give him a some equity when the corporation was formed.

In May, 2005, Cabot and Bach retained Attorney Patrick Jones of Gesmer Updegrove, LLP, to assist in forming Where to Park and Parking Media as corporations, advising them as to corporate formalities, and drafting various licensing and use agreements.[18] Cabot and Bach met and communicated with Jones on a variety of issues, including Joel Gwynn's status. Towards the end of May, Cabot informed Bach that she no longer wanted to give Gwynn an equity interest in

---

[17] To the extent that there is a disputed fact regarding the use of Infosage maps in the redesigned Where to Park venture, the court credits fully the testimony of Robert Murphy that the maps used in various Where to Park prototypes, mock-ups, and website postings were created by Murphy. Many of the Where to Park drafts contained neighborhood maps that bore the language, "Copyright by Infosage, Inc." at the bottom of the map. Additionally, as a safeguard to misappropriation, Murphy embedded several of his maps with fictitious names, for instance, "Murphy Square," at the corner of Milk and Water Streets in the Financial District, as a way of identifying his creation. Luckily for the venture, Google introduced web-based maps that, by the summer of 2005, became open-source material, available for use to anyone without license. Prior to that time, however, there was a scramble to seek usable maps unrelated to Infosage.

[18] In various presentations to Boston parking vendors, including Standard Parking, FitzInn Parking Systems, and Friends of Post Office Square, Cabot and Bach had solicited interest in their prototype guide and website under the name, "Where to Park, a Division of Parking Media, Inc." even though no such corporate entity yet existed.

-13-

the company, asking, "What's he going to do, sue us?" Bach objected, saying that Gwynn had

become an essential member of the venture and had been promised a share in the profits.

Cabot's treatment of Gwynn[19] created a wedge between Cabot and Bach. Their relationship

became acrimonious as each took actions (calls and meetings with third parties) without advising

the other.[20]

     The hostile working relationship arose at a pivotal time in the corporate venture. On June

6, 2005, Bach traveled to Nashville, Tennessee for a sales pitch to senior executives at Central

Parking, one of the nation's largest parking vendors. She reported that the director of

procurement responded enthusiastically to the concept of a centralized parking marketplace and

did not balk at the cost of advertising. Bach stated that based on Central Parking's positive

response, she would seek a similar sales meeting with Standard Parking, another national parking

provider. Bach also indicated that she told Central parking that Where to Park was looking to

roll out the guide and website at the end of June.

     The following day, June 7, 2005, Cabot (unbeknownst to Bach) sought advice from Jones

regarding Gwynn and Jason Whyman, the layout designer whose drafts of the guide were flawed.

Cabot told Jones that she questioned the quality of the work performed by both men and was

concerned about securing control over the website and its content. Jones appropriately e-mailed

Bach, summarizing the meeting and his recommendations. In response, Bach defended the work

of both consultants and suggested that given the disagreements she had with Cabot regarding the

---

[19] Cabot gave Gwynn a check for $2,000 on June 4, 2005, endorsed (and receipted) as
"payment in full" for Phase 1 work. Gwynn refused the check.

[20] See, e.g., Exhibit 71.

-14-

venture's management, it might be time to "split up 'the assets' such as they are."[21]  Thereafter, Bach proposed splitting the venture into two components:  Bach would focus on aggregating parking information for Boston (and then nationally) on WheretoPark.com, and Cabot would continue developing advertising opportunities for neighborhood businesses which would be posted on the website.  Jones e-mailed both parties stating that as corporate counsel, he could facilitate a splitting of the company so long as both sides agreed but could not represent one side over the other.  On June 9, 2005, Cabot e-mailed Jones and Bach stating that she would accept Bach's proposed division of the business on certain terms and conditions, most notably that if Bach failed to meet certain milestones within fixed time periods, she would transfer 40% of her (50%) equity interest in the company to Cabot, who would continue holding her own 50% share.

The fragile relationship between Cabot and Bach further ruptured when, between June 8 and 10, 2005, Bob Murphy asserted copyright claims on behalf of Infosage.  On June 9th, Gwynn e-mailed Bach a link to the Infosage.com website, asking, "What's up with this.  Did they steal our idea or did we steal theirs?"[22]  Bach communicated with Murphy by phone, e-mail, and in person over the next twenty-four hours.  Murphy informed Bach that Cabot had walked away from Infosage but did not have any right to use the *Guide* materials, all of which were copyrighted to the corporation.[23]  Bach e-mailed Cabot on June 9, 2005, accusing her of lying when she represented that she had the right to use Infosage's proprietary data and engaging in a conflict of interest given that she still held 50% of Infosage stock.  Bach wrote, "Melanie, I do

---

[21] Exhibit 72.

[22] Exhibit 73.

[23] Testimony and Exhibit 76.

-15-

not want to be your partner, everyone cannot be wrong . . . [and ending] . . . You may have a battle on more than one front here and I think your record on this issue is well-established."[24] Both Bach and Cabot consulted with Attorney Jones; Cabot falsely stated in an e-mail, "None of the artwork, sketches, photographs, drawings, and related visual compositions developed by Infosage was ever used by Where to Park."[25]

After June 10, 2005, there was no semblance of a working relationship between Cabot and Bach. On June 20, 2005, Joel Gwynn wrote to Cabot asserting that Cabot breached her verbal agreement to give him an equity share of the company and claiming ownership interest in any computer code that he developed pending appropriate compensation. At that point, Cabot had removed the Where to Park website, but Gwynn had disabled much of its content. At around the same time, Susan Bach formed a new company, ParkingTools.com, in collaboration with Gwynn.

Cabot enlisted the aid of Gesmer Updegrove, LLP (Lee Gesmer, a named partner taking over the matter from Patrick Jones) to bring suit against Gwynn, Bach, and ParkingTools.com in Suffolk Superior Court.[26] The complaint, brought in the name of Parking Media, LLC, asserted claims of breach of contract against Gwynn, intentional interference with contractual relations against Gwynn and Bach, and violations of G.L. c. 93A. In addition to damage claims, the complaint sought to enjoin Gwynn from competing with Where to Park for a year, and from using any information acquired from Where to Park. On the recommendation of Gesmer, Cabot

---

[24] Exhibit 74.

[25] Exhibit 78.

[26] Exhibit 89.

Exhibit "A"

prepared a press release for distribution to her business advisors and the media. In the release, Cabot accused Bach of sabotage and theft of software code belonging to Where to Park.

Bach filed counterclaims against Cabot and Where to Park, Inc. in December, 2005. One year later, in December, 2006, Murphy, individually and on behalf of Infosage, was permitted to intervene and asserted claims against Cabot and Where to Park, Inc. The Massachusetts court proceedings were stalled when, in August, 2007, Cabot filed a bankruptcy petition in the Southern District of Florida. In her schedule of assets and liabilities, Cabot listed Susan Bach, Joel Gwynn, ParkingTools.com, Infosage, Inc., and Rob [sic] Murphy as unsecured creditors in connection with the Suffolk litigation and listed the "amount of claim" as to each as $350,000.[27]

In the end, Bach shut down her ParkingTools.com website, and the Parking Media, LLC lawsuit was dismissed with prejudice. Prior to that time, however, Cabot appeared on a Fox Television news story regarding Susan Bach. Mike Beaudet, an investigative reporter at Fox News, aired a story regarding an investigation by the Attorney General into a failed fund-raising effort by Bach for the Susan Komen breast cancer charity. The story suggested that Bach had solicited and received donations for an event that never occurred. After that lead, Beaudet reported that Bach was also being sued by Parking Media, and had an on-air quote by Cabot stating, "I was shocked that she would be so aggressive as to take something that I had paid for and developed and start a competing company."[28] According to Bach, she was embarrassed and humiliated by Cabot's interview, remained indoors as a result, and sought counseling.

---

[27] Exhibit 104.

[28] Exhibit 103.

## RULINGS OF LAW

### MURPHY/INFOSAGE CLAIMS

Murphy and Infosage assert claims against Cabot and Where to Park, Inc. for breach of fiduciary duty (Counts I and II) and violation of G.L. c. 93A (Count VII). Infosage asserts additional claims for unfair competition (Count III) and tortious interference with prospective business advantage (Count VI). Although there is some overlap between the various claims, each requires proof of discrete elements. The Court will address each claim in turn.

### Counts I and II - Breach of Fiduciary Duty

Murphy asserts that Cabot breached her fiduciary duty as to Infosage (Count II) and Murphy (Count I). Directors and officers of a corporation stand in a fiduciary relationship to the corporation. *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 528 (1997). They owe the corporation and its shareholders a duty of care and a "paramount duty of loyalty." *Id.* at 528. Because Infosage was a close corporation involving Murphy and Cabot as the sole shareholders, directors, and officers, Cabot's duty of utmost good faith and loyalty applied equally to Murphy. *Donahue v. Rodd Electrotype Co. Of New England, Inc.*, 367 Mass. 578, 592-94 (1975). Shareholders in a close corporation "must discharge their management responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.* at 593. Shareholders in a close corporation are not permitted to frustrate the reasonable expectations of the other shareholders with respect to shared ownership, such as with regard to the fair distribution of income and assets, shared decision-making, control of the business, and the receipt of fair value for their contributions to the enterprise. See *Wilkes v.*

-18-

*Springside Nursing Home, Inc.*, 370 Mass. 842, 850 (1976).  Moreover, the fiduciary duty owed

by a shareholder in a close corporation exists even after the shareholder resigns as a corporate

officer or director.  See *Selmark Associates, Inc. v. Ehrlich*, 467 Mass. 525, 551-552 (2014).

      The evidence demonstrates unequivocally that Cabot willfully disregarded her obligations

to Murphy and to the corporation.  Cabot invited Murphy to join her in the creation of a parking

guide and together, they labored for over eighteen months, gathering information and data and

formatting it into a pocket guide.  They identified 181 public parking lots and garages in Boston,

recording their street location, hours of operation, and rate structure.  Murphy purchased

seventeen sectional map templates from a Florida vendor and edited each to include the location

of each garage or parking lot, as well as significant public areas and features.  Recognizing the

value of the data collected, Cabot and Murphy incorporated Infosage in August, 2003.  Each

became an equal shareholder in and an officer of the corporation, whose purpose was to publish

and sell the parking guide.  They created a website, Infosage.com, principally as a means of

taking orders for their book because they were rebuffed in their efforts to market the *Guide*

through bookstores or event organizers.  Infosage's sales plan contemplated that a customer

would order the *Guide* through the website, paying by credit card that Cabot would process with

their newly-purchased card terminal, and Murphy would ship the *Guide* from the inventory

stored in his home.

      This Court finds that Murphy acted diligently and effectively in moving the *Guide* to

market.  He kept Cabot informed as to the progress of the publication as it went through the

design and publication stages and kept her appraised as to sales efforts and orders.  Cabot, by

contrast, did not perform with the same level of commitment or good faith.  She frequently found

-19-

flaws with the *Guide* and with Murphy as well. In December, 2003, when there should have been a full-scale effort to market the *Guide*, Cabot could not be located (apparently she went to Florida for an extended holiday) and upon her return, told Murphy that she wanted to scrap the first edition and engage new design experts to revise the *Guide*. Murphy disagreed, noting that they had paid over $10,000 to get 2,500 copies of the *Guide* printed and available for sale.

Management disagreements are not uncommon in the business world, and a mere disagreement over corporate affairs does not demonstrate bad faith or disloyalty, nor does it generally lead to litigation. The law contemplates that intra-enterprise disputes will be resolved in the usual course, provided the principals involved remain loyal to the enterprise and act in good faith. Such was not Cabot's course of action in 2004. Unable to persuade Murphy to agree to her plan, Cabot abandoned her responsibilities to Infosage and surreptitiously undertook to create a competing company. She took the *Guide*, misrepresenting that she had sole ownership of the copyrighted material and proprietary information, and solicited Susan Bach to join her in a new enterprise built on the foundation constructed by Infosage.

Cabot's breach of her fiduciary duty was knowing and intentional in addition to being egregious. She affirmatively directed the disabling of the Infosage website and refused to provide the company's credit card terminal, in order to prevent Murphy from being able to sell the *Guide* and establish Infosage's presence in the marketplace.[29] She falsely represented that she solely owned the content of the *Guide* and had the right to make use of it, while at the same time,

_____

[29] Cabot's efforts to eliminate Infosage from the marketplace was necessary to the success of Where to Park. If Infosage continued to sell the *Guide* and maintain its online presence, Bach and others would likely have learned of Cabot's deception far earlier in time. Moreover, being first in the marketplace was a critical factor in Where to Park's efforts to solicit memberships and advertising from parking vendors and neighboring businesses.

Exhibit "A"

she pursued Murphy to execute a licensing agreement under false pretenses.  It is difficult to imagine what more Cabot might have done to undermine the corporate interests or welfare of Infosage, or impair the value of Murphy's equity interest in the company.

### Count III - Unfair Competition

"The gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of goods or services." *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 769 (1986).  A plaintiff may recover for an unfair competition claim "by showing either 'palming off' or that the features of the product . . . [or service] have acquired a secondary meaning such that confusion as to its source is likely to arise if the defendant is allowed to copy them . . . . 'Palming off' or 'passing off' is an attempt to deceive the public into believing it is trading with one person when in fact it is dealing with another." *Id.* at 768-769 (citations omitted).

This claim fails on several grounds.  While there were similarities between Infosage's *Guide* and what Cabot and Bach intended to market under the Where to Park name, the latter venture was different in key respects.  Where to Park envisioned developing parking guides on a national scale, Boston being but the first of many metropolitan areas.  Where to Park also envisioned a more robust online presence in the form of an interactive website where parking vendors could advertise through their own mini-websites accessed through the WheretoPark.com portal.  Cabot sought to connect each parking venue to its surroundings, describing the website as a virtual neighborhood marketplace, and intended to solicit local businesses, theaters, restaurants and other commercial establishments to advertise on their website.  Thus, although the location and rates of parking facilities was at the core of Infosage's business model, it was one of many

-21-

features envisioned by the Cabot/Bach venture.  Moreover, there were distinct differences

between the Infosage *Guide* and the design of Where to Park's website and contemplated book.

The print, logo, contact information, and access to each business's respective website was

different and likely, a consumer seeking one would not be unwittingly directed to the other.

Finally, Infosage is not able to demonstrate that any consumer confusion ever occurred since the

Where to Park venture imploded before it became commercially viable.

### Count VI - Tortious Interference With Prospective Business Advantage

To sustain a cause of action for tortious interference with contractual relations or

advantageous business relations, the plaintiff must establish that: (1) the plaintiff had a contract,

expected contract or other advantageous business relationship with a third party; (2) the

defendant knew of the contract or business relationship; (3) the defendant interfered with the

relationship and/or induced the third party to breach or otherwise impair the contract or

advantageous relationship; (4) the defendant acted out of improper motive or employed improper

means; and (5) the defendant's conduct caused the plaintiff pecuniary harm.  See *Ayash v. Dana

Farber Cancer Inst.*, 443 Mass. 367, 394-395 (2005).  See also *Dziamba v. Warner & Stackpole

LLP*, 56 Mass. App. Ct. 397, 408 (2002) ("The tort of wrongful interference with advantageous

business relations requires proof by the plaintiff that he had a contract with a third party; that the

defendant knowingly induced the third party to break the contract; that the plaintiff was harmed

by the defendant's actions; and that the defendant acted with an improper motive or means.").

An advantageous business relationship includes not only existing but contemplated contract or

business relations with probable economic benefit.  See *Comey v. Hill*, 387 Mass. 11, 19 (1982).

That said, the element of economic loss required to establish tortious interference cannot be

Exhibit "A"

established by "speculation or conjectural losses." *Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass. App. Ct. 506, 510 (1980).

There is no question that Cabot intentionally caused the disabling of the Infosage website to prevent Murphy from marketing and selling the *Guide*, satisfying the first three elements. Further, the evidence shows that Cabot was motivated by a desire to dissolve Infosage in order to establish a better and more versatile book and website, and that she used improper means (disabling the website and retention of Infosage's credit card terminal) to carry out her plan. Thus, the fourth element is proven. As a result of her actions, Infosage was unable to sell its product to prospective customers and unable to issue updates on its webpage to existing customers, causing an economic loss. The damages flowing from tortious interference are, in the main, subsumed within the claim for breach of fiduciary duty and need not be restated here.

### Count VII - Breach of G.L. c. 93A

General Laws c. 93A, § 11 extends the prohibition against engaging in unfair or deceptive acts or practices in the conduct of any trade or business to those engaged in trade or commerce in business transactions with others similarly engaged. *Datacomm Interface, Inc. v. Computerworld, Inc*. 396 Mass. 760, 779 (1986). Conduct "in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 474 (1991), quoting *Wang Laboratories, Inc. v. Business Incentives, Inc*., 398 Mass. 854, 857 (1986).

To make out a claim under G.L. c. 93A, § 11, the plaintiff must show that (1) both parties are engaged in trade or commerce; (2) the defendant committed an unfair or deceptive act; (3) the plaintiff suffered damages connected with the unfair or deceptive act; and (4) the unfair and

Exhibit "A"

deceptive act occurred primarily and substantially in Massachusetts.

Generally, disputes between partners and shareholders do not meet Chapter 93A's jurisdictional "trade or commerce" requirement. See *Szalla v. Locke*, 421 Mass. 448, 451 (1995); *Zimmerman v. Bogoff*, 402 Mass. 650, 662-663 (1988). The reach of Chapter 93A "exclude[s] intra-enterprise disputes because they are more similar to purely private disputes and are not 'commercial transactions . . . in the sense required by c. 93A.'" *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 23 n.33 (1997), quoting *Szalla v. Locke*, 421 Mass. at 452. Examples of intra-enterprise disputes which are not actionable under Chapter 93A include "disputes between individual members of a partnership arising from partnership business, and transactions and disputes between parties to a joint venture between fellow shareholders." *Id.*

To sustain a claim under Chapter 93A, Murphy and Infosage must prove that any deceptive act or practice involved the defendant acting in a "business context" rather than resulting to a corporate governance dispute. *Begelfer v. Najarian*, 381 Mass. 177, 190-191 (1980) (defendant partner's creation of a competing business to strip plaintiff of its contract work did not occur in the ordinary conduct of trade or commerce within the meaning of c. 93A; plaintiff's remedy lies in an action for breach of fiduciary duty). Applied to the present case, this principle precludes liability based on Cabot's decision to abandon her partnership with Murphy in Infosage and her unilateral decision to disable the website and scuttle sales of the *Guide*. As wrongful as such conduct was, it arose out of disagreements with Murphy regarding the quality of the *Guide* and the need to pull it from the marketplace and redesign it. Further, because such conduct occurred before there was any parallel venture involving Bach and before the formation of a partnership, it cannot be said that Bach (or Parking Media, LLC) aided or abetted Cabot in

-24-

Exhibit "A"

the commission of a false or deceptive act.  See e.g. *Beninati v. Borghi*, 90 Mass App. Ct. 556, 566-567 (2016) (outsiders who assist an employee in their breach of duty of loyalty may be liable under c. 93A).

Likewise, Cabot's use of Infosage maps and use of the Infosage *Guide* as a template for a redesigned and expanded publication exposes her to liability for breach of her duty of loyalty to Infosage, but did not directly cause any harm or economic injury to Infosage as a result. Although Cabot and Bach used the *Guide* as a marketing tool to explain their contemplated business, neither Murphy nor Infosage were aware of the effort and there is no evidence that sales of the *Guide* were impacted by the contemplated Where to Park company, which in the end, collapsed before coming to the marketplace.  Similarly, Murphy has presented no evidence that any corporate opportunity was lost as the result of Cabot's partnership with Bach and Where to Park.

For all of these reasons, the Court rules that the plaintiffs (Murphy and Infosage) are not entitled to recovery under G.L. c. 93A, § 11.

### Damages Owed to Murphy/Infosage

Damages arising out of a breach of fiduciary duty or tortious interference are remedial in nature.  Where the breach involves self-dealing conduct to the detriment of the corporation, rescission of the wrongful event and restoration of the parties to their pre-breach position is appropriate.  *Coggins v. New England Patriots Football Club, Inc.*, 397 Mass. 525, 535 (1986). Where a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, restitution of his gain is appropriate to deny any profit to the wrongdoer or his unjust enrichment. *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. at 556.  If equitable relief is not feasible,

-25-

Exhibit "A"

money damages should be awarded. *Coggins v. New England Patriots Football Club, Inc.*, 397 Mass. at 535-536.

Murphy seeks money damages for himself and Infosage because equitable relief, in the form of restitution or rescission, does not apply based on the fact that Cabot's efforts to create Where to Park as a competing company, collapsed without generating any revenue or profit. That the award of money damages is warranted is unquestionable based on Cabot's improper and illegal conduct, but the amount of those damages is disputed. Murphy presents two alternative approaches to determining damages.[30] In the first, he asserts that base damages should be set at $350,000–the amount Cabot listed as Murphy/Infosage's unsecured claim in her bankruptcy petition, to be trebled under Chapter 93A to $1.5 million (plus attorney's fees). In the second approach, Murphy/Infosage claims as damages all monies expended by the corporation to continue in operation, the value of lost revenue when the *Guide* could not be sold, and the cost of restoring the Infosage website, a monthly "rental value" for Cabot's misuse of the *Guide* as a template for creating a new book, the misappropriation of the web domain, "WheretoPark.com," reimbursement for office and storage space at Murphy's home, lost projected revenues on the sale of books from 2004 to 2009, legal costs and expenses related to litigation in Massachusetts and Florida, and reimbursement for the value of Murphy's time in pursing his claims against Cabot. According to a detailed schedule of costs and expenses, Murphy claims damages of $617,817 due to Infosage, and $524,283 due to Murphy individually.

Neither alternative is legally satisfactory. The first approach derives from a schedule of creditors Cabot submitted to the Bankruptcy Court in 2007. Cabot estimated the value of claims

---

[30] See *Plaintiff's Proposed Findings of Fact and Rulings of Law*, p. 43.

-26-

by Murphy, Infosage, Bach, Gwynn, and ParkingTools.com as each totaling $350,000, without

any information as to the basis for the estimate.  The plaintiff has failed to provide any legal

support for the proposition that an estimate as to the value of an unsecured creditor's claim in

bankruptcy constitutes a binding admission as to the actual value of the underlying liability.  To

the contrary, a debtor in bankruptcy would likely be expected to estimate the worst-case outcome

of a contested debt, reserving the right to challenge the debt in litigation if the debt was not

discharged in bankruptcy.  Moreover, Cabot's attribution of a single value ($350,000) to each of

the claims listed in her schedule of unsecured creditors relating to her parking guide venture

suggests that the amount was not the product of any careful or deliberate calculation.

    The second approach is unacceptable for several reasons.  First, it is overbroad: Murphy

seeks damages on his and Infosage's behalf for *every* cost and expense incurred by the parking

endeavor, including intangibles such as the monthly cost of such things as storage and office

space at Murphy's Southboro home; a monthly "rental value" for Cabot and Bach's use of the

*Guide*, the domain name, "wheretopark.com," and the Infosage maps (all of which Murphy

subjectively calculates as totaling $152,263); and legal fees and expenses to pursue Cabot in the

instant case and appear in opposition at the bankruptcy proceedings in Florida (notwithstanding

that such fees are not recoverable under the American Rule).

    Second, Murphy seeks damages for "potential income" based on the assumption that the

*Guide* would have generated steady and expanding sales through 2009 totaling $439,020.[31]  The

plaintiff has failed to prove that such a calculation is based on any reliable methodology.  Indeed,

if the prospect of success was reasonably clear, one would expect that Murphy and Infosage

---

[31] Exhibit 109, p. 6.

would have continued selling the *Guide* once the website was restored and a new credit card terminal was acquired.[32]

Damages must bear an actual and reasonable relationship to the loss sustained by the injured party which, in the context of the parties here, is Infosage, the corporate enterprise that Murphy and Cabot formed and to which Cabot owed a fiduciary duty.[33]  Prior to Cabot's departure in the beginning of 2004, Infosage had established its website and printed 2,500 copies of its *Guide*.  The obvious next step for the business was to market and sell the printed book.  It was critical to the sales model that the Infosage website was operational since that was how orders for the *Guide* were received and paid for through credit card payments.  When Cabot ordered Yurevich to disable the website, she effectively prevented Infosage from selling its product, and further prevented payments from being processed by refusing to provide Murphy with the company's credit card terminal.  For all intents and purposes, Cabot shut down the company for many months until Murphy was able to gain control over the website, redesign its content, and purchase a new terminal to process payments.  Further, delays in selling the *Guide* in a timely manner decreased its sales value because by the time Murphy was able to get all of the

---

[32] Notably, Cabot's treachery in using all of Infosage's proprietary data, to include maps and data in an effort to establish a competing company did not actually effect Infosage's operations; only the disabling of the website and conversion of the credit card terminal impacted actual sales.  In a damages analysis, the result here would be markedly different if Where to Park actually got off the ground and publicly competed with Infosage.

[33] In point of fact, there is no difference in whether damages for breach of fiduciary duty are awarded to Infosage or to Murphy individually.  In light of the hundreds of hours Murphy put into the business after Cabot resigned her positions as an officer and director, and in light of the thousands of dollars Murphy spent (over and above development costs), any award to Infosage will likely go directly to Murphy as reimbursement or salary.  Given the amount of this Court's damage determination, it is unlikely that there would be any amount remaining subject to disbursement to shareholders, to include Cabot who still holds 50% of the stock.

Exhibit "A"

pieces in place to aggressively sell the book, information in the first edition, such as hourly rates or hours of operation, had in some cases changed, and some parking sites had disappeared.[34] Viewed in this manner, Infosage's loss is largely based on its unsold inventory of first-edition *Guides* (less shipping costs), which Murphy calculates to be $21,328.

Damages also include the costs associated with restoring the Infosage website and processing book orders, to include $400 paid to Steady Vision, a website developer, and $513.45 for the purchase of a replacement credit card terminal. Murphy/Infosage is further entitled to reimbursement for the value of Murphy's time for the period from February or March, 2004 until November 28, 2004, during which Murphy had to direct his efforts to restoring Infosage's website rather than actively marketing and selling the *Guide*. As reflected in his schedule of damages (Exhibit 109), Murphy dedicated 118.58 hours to undoing the harm caused by Cabot which, at an eminently reasonable hourly value of $75, which totals $8,893.50. Added together, damages due to Murphy and Infosage equal $31,134.95.

## BACH CLAIMS

Bach advances five claims against Cabot and Where to Park, Inc.: breach of fiduciary duty (Count I), fraud and misrepresentation (Count II), breach of contract (Count III), defamation (Count IV), and violation of G.L. c. 93A (Count V). Insofar as there is substantial overlap between the first three counts, the Court will address them collectively.

### Counts I-III - Breach of Fiduciary Duty, Misrepresentation, Breach of Contract

Bach asserts that from the beginning of their joint venture, Cabot made a series of false

---

[34] This is best seen in the *Guide's* map for the Seaport District, which listed over fifteen parking lots and garages, a number of which were developed as the commercial and residential market expanded in that section of the city.

Exhibit "A"

statements that Bach relied on in continuing with the business venture and that ultimately led to the collapse of their mutual endeavor. In particular, Bach claims that Cabot misrepresented that she had the full and exclusive rights to the Infosage *Guide*, its maps, and data; that she owned the domain name, "WheretoPark.com;" that her contribution to the new business venture was the *Guide* and its content to induce Bach to expend an equal amount of time in furthering the venture; and that she secretly formed a Delaware LLC rather than incorporating the Where to Park corporation with Bach.

To prevail on her claim for fraud, the plaintiff must prove that a party "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied on the representation as true and acted upon it to his damage." *Slaney v. Westwood Auto*, 366 Mass. 688, 703 (1985) (citations omitted). A misrepresentation is material if it causes a party to take a particular action for which the misrepresenting party intended and for which the party would not have otherwise taken but for the misrepresentation. *National Car Rental Sys., Inc. v. Mills Transfer Co.*, 7 Mass. App. Ct. 850, 851 (1981).

Based on the facts as found by this Court discussed above, there is no dispute that Cabot misrepresented her ownership and unfettered right to use the *Guide* and its contents. As earlier discussed, the *Guide* was the property of Infosage, which had a proprietary interest in the maps and data collected and organized into a coherent whole. Cabot owed a fiduciary duty to Infosage that she breached by using the *Guide* as a basis to form a competing business. Her justification, that the Where to Park venture would produce a superior product to the Infosage publication, is a poor excuse for her wrongful conduct.

-30-

Exhibit "A"

By the same token, Cabot presented the *Guide* to Bach as an example of a first effort to collect and catalogue parking venues in Boston that could serve as a foundation for marketing parking information in book form and through the burgeoning internet. From their first meeting in the winter of 2004, Cabot enticed Bach to join her in developing a business by representing that she owned the *Guide* because her former partner, Bob Murphy, was no longer interested in pursuing it. It was critical to Cabot's enlistment effort that Bach accept Cabot's misrepresentations, which she did. Thereafter, Bach dedicated her time and energies for months to develop the Where to Park concept and bring it to the marketplace. Throughout these efforts, the *Guide* maps were used in the templates for the website and contemplated book, and used during all of the marketing meetings. The evidence shows convincingly that Bach relied on Cabot's false representations regarding her exclusive right to use the *Guide's* material.

At issue, then, is whether Bach's agreement to join Cabot, and subsequent efforts in developing Where to Park occurred in reliance on Cabot's continuing misrepresentation or, put another way, whether Bach would not have entered into her arrangement with Cabot had she known the true state of affairs, or remained in the venture once the truth was known. The answer to this question differs depending on the point in time when it is considered. At the outset, in the early winter of 2004, Bach saw that the prospect of a source of parking information as attractive and marketable from a business perspective. Over time, Cabot and Bach conceived of ways to expand the revenue-producing aspects of the venture, to include a robust internet presence and advertising opportunities for parking vendors. Bach prepared a business plan that projected exponential sales and advertising revenues exceeding fifty million dollars over five years. Her plans were delayed, but not undone, when Cabot disclosed "problems with the maps" in March,

-31-

Exhibit "A"

2005, and later in June, when Bach received greater detail from Murphy.  Significantly, however, once Bach knew the full extent of Infosage's interest in the *Guide* materials, she nonetheless endeavored to keep the Where to Park venture alive.  When she was unable to come to an agreement with Cabot regarding future governance and operations, Bach had no qualms about taking the Where to Park concept and materials and attempting to develop a finished website without Cabot.  In essence, Bach did to Cabot what Cabot had done to Murphy.

Under these circumstances, the Court rules that while Bach relied on Cabot's misrepresentations about ownership of the *Guide* materials and entered into the business venture in reliance on those statements, she is not entitled to damages based on her misrepresentation claim that accrued after she became aware of the falsity of Cabot's statements and nonetheless stayed involved in the business.

To prevail on a claim for breach of contract, the plaintiff must show that (1) there is a contract; (2) the plaintiff performed their obligations under the contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of the defendant's breach.  See *Singarella v. Boston*, 342 Mass. 385, 387 (1961 (citations omitted).  Where the contract relates to the creation of a partnership or close corporation, it includes fiduciary obligations, to include "a duty of the highest degree of good faith and fair dealing."  *Starr v. Fordham*, 420 Mass. 178, 183 (1995).  An implied covenant of good faith and fair dealing (as between partners) also exists in every contract.  *Id.* at 184.  Unquestionably, where one partner is induced to enter into a partnership based on another partner's fraudulent statements or misrepresentations, there is a breach of fiduciary duty.

As a predicate to her claims for breach of fiduciary duty and breach of contract, Bach

-32-

must prove that there was a contract-based relationship between herself and Cabot.  In this regard, the use of business or corporate names are of little help because Cabot and Bach referred to their venture under several corporate headings ("Where to Park" and "Parking Media, Inc.") but never sought to incorporate anything until May, 2005.[35]  Bach nonetheless contributed hundreds of hours of time and effort in developing a business plan, soliciting interest among national parking companies, trade associations, advertisers and others throughout 2004 without compensation, expecting that she would have an interest in the company when it was formed.

Cabot and Bach discussed becoming partners in the Where to Park venture in the summer of 2004 and formalized their association by executing a "Letter of Agreement between Melanie Cabot and Susan Bach Regarding Parking Media, Inc - Where to Park, Inc." ("Letter Agreement") in January, 2005.  The Latter Agreement established the respective (and equal) interests of both women in the Where to Park venture.  Although the Letter Agreement was drafted by Bach, Cabot freely signed it on January 30, 2005, thereby creating a written and binding partnership.

The Letter Agreement had several material components.  It contemplated the formation of a corporation, and Cabot warranted that she had the right to use all of the *Guide* materials free and clear of claims by any third party (Infosage).  Cabot and Bach agreed to keep confidential

---

[35] As noted herein, Cabot established a Delaware limited liability corporation in October, 2004 under the name, Parking Media, LLC.  Cabot was listed as the sole member of the LLC, and Bach had no formal interest in it.  Although the LLC existed, it was never referenced in any business plan, marketing materials, sales presentations, or draft contracts to be used with advertisers.  Similarly, it was not an obstacle to Cabot and Bach's efforts through Gesmer and Updegrove to establish a formal corporation under the name, Parking Media, Inc.

-33-

Exhibit "A"

"all pertinent information . . . and all trade secrets proprietary to the company."[36]  Further, both partners agreed that "[T]hey shall not compete with each other or the company."  Cabot and Bach agreed to share equally in any revenues generated through Where to Park after reimbursement for development costs.  Finally, they agreed that any hiring or contract decisions required mutual written agreement.

Cabot's warranty regarding sole ownership of the *Guide* and its contents was false, as she well knew (as evidenced by her repeated but unsuccessful requests to Bob Murphy to sign a licensing agreement).  The *Guide* served as a template for the creation and content of the wheretopark.com website throughout 2004 and into 2005.  Much of the *Guide's* content, including maps and the entire introductory page were included in a mock-up written guide that Cabot and Bach had designed and used in marketing efforts with parking providers and others.  Although Cabot disclosed that "there could be problems with the maps" during a luncheon meeting with Bach in March, 2005, she was not forthcoming regarding the full extent of those problems.  Indeed, as Cabot and Bach moved toward the formal incorporation of the Where to Park venture, retaining Attorney Patrick Jones to formalize the company, Cabot continued to withhold critical information regarding Infosage's proprietary rights and interests.  Her conduct undermined a material component of the partnership agreement and constituted a breach of that agreement as well as a breach of Cabot's duty of fidelity and honesty.

Bach claims that Cabot also breached her duty of good faith and loyalty by secretly forming Parking Media, LLC in October, 2004.  In her trial testimony, Cabot acknowledged that she created Parking Media, LLC without telling anyone and that she was the sole member of the

---

[36] Exhibit 44.

-34-

company, not granting membership status to Cabot.  Notwithstanding Cabot's testimony, other evidence suggests that Bach was not as unaware of the LLC as she now claims to be.  In her comprehensive time sheets for 2004, Bach recorded that she spent two hours with Cabot on October 18, 2004, the subject of which was "[S]uggest Cabot form Delaware LLC to deduct her expenses, my stock issued later, formality."[37]  This entry roughly coincides with the actual creation of the LLC.  Moreover, there is no evidence demonstrating that Cabot used the LLC to claim ownership of the materials created by the Cabot-Bach endeavor (except in the instant litigation as discussed *infra*) or as a substitute for the intended formation of a corporation involving Bach and Cabot as equal shareholders in the spring/summer of 2005.  Both the testimony of Bach and Cabot as well as exhibits reflecting communications with Attorney Patrick Jones show that the women intended to form a new corporate entity that they would own as equal shareholders.  Consequently, Cabot's actions in forming Parking Media, LLC did not constitute a breach of fiduciary duty nor a breach of the partnership agreement that was subsequently entered into.

### Count IV - Defamation

To establish defamation, the plaintiff must demonstrate that "(a) the defendant made a statement, concerning the plaintiff, to a third party. . . (b) the statement could damage the plaintiff's reputation in the community . . . ; (c) the defendant was at fault in making the statement . . . ; [and] (d) the statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss."  *Ravnikar v. Bogojavlensky*, 438 Mass 627, 629-630 (2003).  In most cases, the defamatory statement must be false.  *See Bender v. Metropolitan Life*

---

[37] Exhibit 116, p. 3.

-35-

*Ins. Co.*, 313 Mass 337, 342 (1943). However, in the context of a private person, it is not

necessary that the statement be maliciously published; negligent publication of a false statement

will suffice to prove defamation. *Jones v. Taibbi*, 400 Mass. 786, 799 (1987).

A statement is defamatory when it "would tend to hold the plaintiff up to scorn, hatred,

ridicule, or contempt, in the minds of any considerable and respectable segment of the

community." *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975). In assessing

whether a statement is defamatory, courts look at the "statement in its totality in the context in

which it was uttered or published." *Myers v. Boston Magazine Co.*, 380 Mass. 336, 341-342

(1980). Where the statement is substantially true, minor inaccuracies will not support a

defamation claim. *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 770 (2003).

Bach contends that Cabot defamed her when Cabot appeared on a Fox News broadcast

that aired on January 30, 2006, while Cabot and Bach were embroiled in the instant litigation.

The Fox broadcast ran for slightly over three minutes. The first two minutes and twenty-five

seconds dealt with coverage of an attorney general's investigation into a fundraising effort for the

Susan Komen cancer fund. It was reported that Bach had been involved in soliciting donations

for a designers' showcase presentation that never took place, and that the attorney general's

office was investigating Bach's receipt of donations that were never forwarded to the cancer

fund. The story implied that Bach may have misused or misappropriated monies.[38] The reporter

then transitioned to the instant case, stating, "Bach's legal problems don't end there. In an

---

[38] The Fox story regarding an attorney general's investigation was an update on an earlier
broadcast on the same subject. Ultimately, the attorney general's investigation resulted in a
settlement agreement. In terms of public opinion, the allegation that Bach swindled a public
charity was likely the greater cause of any humiliation or embarrassment she experienced than
was the claim that she cheated a business partner.

Exhibit "A"

unrelated case she's being sued by Parking Media.  Bach worked for the Boston internet business last year.  She's accused of stealing the company's ideas, and opening a competing business."  Cabot was then filmed stating, "I was shocked that she would be so aggressive as to take something that I had paid for and developed and start a competing company."

Truth is a defense to a claim for defamation.  *McAvoy v. Shufrin*, 401 Mass. 593, 597 (1988).  See *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629 & n.3 (2003) ("In most cases the statement [at issue] must be false.").  Here, Cabot's oral statement involved a claim that Bach had taken "something" Cabot had developed and paid for and started a new company.  There is no dispute in the evidence that Bach sought to create a new Company, ParkingTools, Inc. together with Joel Gwynn, to establish a website substantially similar to the Where to Park website.  The "something" taken involved the concept of a web-based source of parking information, and likely the data assembled regarding the number, location, and features of parking facilities in Boston.  Thus, the only disputed, and potentially defamatory utterance involved Cabot's claimed development and financing of the parking venture.  As between Bach and Cabot, Cabot had the greater claim to originating the concept of a parking guide, and the evidence shows that she financed various (though not all) costs associated with the Where to Park venture.  The evidence also demonstrates that Bach sought to establish a competing company notwithstanding the January, 2005 partnership agreement with Cabot which precluded either partner from making use of the information or data they had acquired or from competing with one another.  Under all these circumstances, Bach has not proved that Cabot's statement was false and defamatory.

Exhibit "A"

### Count V - Breach of G.L. c. 93A

Bach's amended third-party complaint asserts that Cabot individually and on behalf of Where to Park, engaged in unfair and deceptive acts or practices in violation of G.L. c. 93A, § 11. "It is well established that disputes between parties in the same venture do not fall within the scope of G.L. c. 93A, Section 11." *Szalla v. Locke*, 421 Mass. at 451 (citations omitted). An action brought under section 11 "requires that there be a commercial transaction between a person engaged in trade or commerce with another person engaged in trade or commerce." *Id.* Disputes between partners, directors or shareholders in a close corporation, relating to matters of internal governance, are not properly subject to a claim under Chapter 93A. *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. at 23 n.33.

Recognizing the inapplicability of section 11 to a partnership dispute, Bach asserts that Cabot engaged in unfair and deceptive conduct in connection with her lawsuit against Bach, Gwynn, and Parkingtools.com. Bach cites a litany of acts and statements that she claims show that Cabot's lawsuit was devoid of merit and filed solely to intimidate and undermine Bach's effort to establish a new venture with Gwynn. The claim is unavailing on the facts and law.

As a jurisdictional matter, Chapter 93A "has never been read so broadly as to establish an independent remedy for unfair or deceptive dealings in the context of litigation." *Morrison v. Toys "R" Us, Inc., Mass.*, 441 Mass. 451, 457 (2004); *Kobayashi v. Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 505 (1997). "This is so because the unfair and deceptive conduct alleged must itself arise from trade or commerce, and not tangentially from litigation concerning that conduct." *Aggregate Industries-Northeast Region, Inc. v. Hugo Key and Sons, Inc.*, 90 Mass. App. Ct. 146, 152 (2016). See *First Enterprises, LTD. v. Cooper*, 425 Mass. 344, 347 (1997)

-38-

Exhibit "A"

(mere filing of litigation does not itself constitute "trade or commerce").

Cabot commenced her lawsuit after Bach unilaterally walked away from the Where to Park venture and surreptitiously created Parkingtools.com. Bach acknowledges that her intent after June 10, 2005, was to work with Joel Gwynn to establish a web-based parking site where parking garages and lots could advertise their services. For all intents and purposes, the new site was to be a replacement for the failed Where to Park site. Bach's actions were expressly prohibited by the non-compete clause of the Letter Agreement with Cabot. Although Bach could assert that she was relieved of any obligations under the Letter Agreement based on Cabot's breaches, that claim had not been determined in any legal forum. Moreover, Bach had acknowledged Cabot's continuing interest in the Where to Park venture when, following the June 10, 2005 disclosures by Bob Murphy, Bach had proposed to Attorney Jones that the Where to Park business be divided into two subsidiary parts where each partner could have complete control over their portion of the venture.[39] Only when Cabot made an unsatisfactory counter-offer did Bach abandon any effort to work within the framework of the partnership and strike out on her own. In short, it was Bach's breach of the partnership agreement that precipitated Cabot's lawsuit which, at least in part, was based at least on a facially valid claim. Bach's further complaints about Cabot's motives in pursuing the lawsuit, her drafting of a press release, and her reference to publicizing the lawsuit to deter funding sources for Bach's new venture, are not so egregious or unusual (in the rough and tumble world of partnership breakups) so as to constitute the level of rascality contemplated by Chapter 93A.

Bach also cites to Cabot's bringing suit in the name of Parking Media, LLC as evidence

---

[39] Exhibit 72.

of Cabot's bad faith conduct. According to Bach, she never had any connection with Parking Media, LLC and indeed was not even aware of its existence. As noted earlier, this Court does not accept Bach's claimed ignorance in light of her time record entry from October 18, 2004. Moreover, Cabot's sole interest in the LLC, created either as a matter of convenience or for tax purposes, did not effect the partnership that was subsequently memorialized in the Letter Agreement. Naming Parking Media, LLC (together with Cabot individually) as a party to the lawsuit added very little to Cabot's claims that Bach misappropriated the Where to Park concept and data.[40]

### Bach Damages

As to claims for misrepresentation, breach of fiduciary duty, and breach of contract, the plaintiff must prove damages as a result of the claimed misconduct. *Ravosa v. Zais*, 40 Mass. App. Ct. 47, 54 n. 12 (1996). Bach submits two alternatives regarding damages; the first, drawn from Cabot's bankruptcy petition (for Bach and Parkingtools.com, each totaling $350,000), and the second, based on Bach's time and expenses during various phases of the project and totaling $460,819.28. As with the damage claims asserted by Bob Murphy, neither approach is acceptable.

Assessing damages based on Cabot's estimate of the value of unsecured creditor claims by Bach and Parkingtools.com suffers from the same infirmity as noted earlier. The amount stated is imprecise and unrelated to the facts found by this Court and the causes of action asserted

---

[40] Bach refers to numerous false statements Cabot made during the course of the underlying litigation and her repeated assertion of the Fifth Amendment right against self-incrimination during her deposition as evidence of the Chapter 93A claim. While false statements in litigation may have legal consequences, they arise in the course of litigation and not in connection with "trade and commerce" so as to implicate Chapter 93A.

Exhibit "A"

in Bach's amended complaint.

The second alternative seeks recovery of all expenses and the time (valued at $75/hour) Bach claims to have spent on the Where to Park venture, as well as all her time and expenses involved in litigation regarding the instant suit and Cabot's bankruptcy proceedings in Florida. Bach asserts that damages should be considered in four categories: (1) damages suffered prior to the formation of a partnership in July, 2004; (2) damages suffered during the partnership but prior to Murphy's disclosures in June, 2005; (3) damages related to Murphy and Infosage's claims; and (4) damages related to Cabot's lawsuit and bankruptcy petition. While the Court finds Bach's damage claims under this alternative overbroad and excessive in some regards, it provides a framework for determining actual damages.

Bach is entitled to damages based on Cabot's misrepresentations for the time period from January, 2004 through July 19, 2004. During this six and one-half month period, Bach worked on developing and improving the parking guide concept without any ownership interest but with an expectation of some financial gain. Whether considered under a theory of misrepresentation or quantum meruit, the result is the same; Bach contributed her legal and business acumen and spent monies to benefit the Where to Park venture, relying on Cabot's assurances that she had the unfettered right to pursue the business and make use of Infosage material. As reflected in Exhibits 106 and 116, Bach spent 121.7 hours and had out-of-pocket expenses of $1,506.36 during this time period. At an hourly rate of $75 (which the Court finds to be reasonable), Bach is entitled to damages totaling $10,633.86 for time and expenses during this time period.

Bach testified that she and Cabot orally agreed to work as partners in the summer of

-41-

2004.  Her time records reflect that agreement to have taken effect on July 20, 2004.[41]  The nature of the partnership and respective interests of Cabot and Bach were not specified at the inception but were later contained in the January, 2005, Letter Agreement.  In either case, Cabot's misrepresentations regarding her right to use Infosage materials, made orally in 2004 and memorialized as a warranty in the Letter Agreement, induced Bach to continue working on the corporate project.  However, in or around March, 2005, Cabot's deception was revealed, at least in part, when she informed Bach that there "might be a problem with the maps."  Nonetheless, Bach did not withdraw from the venture nor take any steps to determine the extent of any claims Infosage might have had against Cabot or Where to Park.  Instead, she continued working with Cabot and actively promoted the marketing efforts to sell the website to parking vendors.  In May, 2005, Bach and Cabot retained Gesmer Updegrove to incorporate the Where to Park venture and develop sales and advertising contracts.  Under these circumstances, where Bach remained in partnership with Cabot after being alerted to the existence of "problems," the Court does not find that Cabot's false statements, whether viewed through the prism of misrepresentation, breach of fiduciary duty, or breach of contract, can justify the *full* value of damages sought by Bach.

As reflected in Exhibit 106, Bach claims to have devoted 1,959.4 hours, and incurred expenses of $16,279.96, to furthering the business between July 20, 2004 and June 9, 2005.  She submitted time sheets purportedly reflecting the time devoted to various aspects of the business.[42]  After a review of the entries, the Court is not satisfied that these records accurately reflect the

---

[41] Exhibit 106.

[42] Exhibit 116.

-42-

Exhibit "A"

time actually spent on the listed activities.  For instance, Bach claims to have spent 30 hours

between July 21 - August 24, 2004, developing a "media kit," the end result of which was a

proposed one-page press announcement.  Between October 10 - December 16, 2004, Bach

attributes 115 hours over 14 work days focused on crafting a Business Plan, followed by another

four full days (34.75 hours) spent on the Business Plan in March and April, 2005.  The end result

of these efforts is a fairly straightforward nine-page description of the Where to Park concept.

Countless hours are listed under the rubric of "Attention to Website" notwithstanding the fact

that Joel Gwynn was the website programmer.  In addition, Bach lists time spent on a weekly

(sometimes more) basis communicating with Gwynn.  Notably, 15 of her entries related to

Gwynn involved telephone calls, each of which occupied exactly 1.25 hours, suggesting a

minimum billing period regardless of the actual amount of time spent on the phone.  Without

parsing the time sheets in greater detail, an exercise the Court is unable to perform with any

degree of precision, the Court is satisfied that an award of 33.0% of the amount requested is a

fair and appropriate measure of damages attributed to Cabot's misrepresentations and breaches of

fiduciary duty and contract.  This results in an award of $48,495.15 for Bach's time, and

reimbursement of $16,279.96 in expenses.

The Court further awards damages in the amount of $11,035.54 for Bach's time

($10,950) and expenses ($85.54) incurred between June 10-26, 2005.  This time period involved

efforts by Bach to deal with revelations about the full scope of Infosage's copyright interests, to

confront Cabot and investigate her denials of Infosage's claims, and efforts to negotiate a

division of the Where to Park venture so that it could remain as a viable business. .

Bach also seeks damages for time and expenses occurring after June 26, 2005.  These

relate to her failed efforts to establish Parkingtools.com, and in pursuing the instant litigation (including a challenge to Cabot's Florida bankruptcy petition). She asserts that she expended hundreds of hours and thousands of dollars to establish and pursue her rights against Cabot flowing from her breach of contract and corollary breach of good faith based on her claims to ownership of the *Guide* and its contents.

The revelations regarding Infosage were, however, only one of several tipping points in what had become an acrimonious working relationship between the two partners. Bach, who had developed a close working relationship with Joel Gwynn, bristled when Cabot refused to abide by an earlier discussion about providing Gwynn with an equity interest in the business. Cabot and Bach also disagreed about the timing of a scheduled roll-out of the website, Bach insisting that it go forward at the end of June, 2005, and Cabot claiming that it needed further refinements. Bach also expressed, orally and in e-mails, her dissatisfaction with Cabot's business approach and work ethic. Fully aware of Infosage's copyright claim, and Cabot's earlier deceptions, Bach nonetheless continued in the partnership, proposing through Attorney Jones that the business be divided into two divisions, one managed by Bach and the other by Cabot. When Cabot made a counterproposal that Bach deemed unacceptable, Bach abandoned any effort to resolve her differences with Cabot or to dissolve the partnership according to accepted business practices and instead surreptitiously coordinated with Gwynn to disable the Where to Park website and establish a new competing business under the name Parkingtools.com.[43] Under these

---

[43] Because Cabot's lawsuit against Bach was dismissed in November, 2007, the Court need not determine whether Bach breached the Letter Agreement in establishing a competing company. However, in assessing damages against Cabot, it is appropriate as a matter of equity to offset the value of the partnership resources that Bach appropriated to her own use in establishing Parkingtools.com.

-44-

Exhibit "A"

circumstances there is no right to a recovery for this category of damages.

Based on the damage determinations above, Bach is awarded damages in the amount of $86,444.51, reflecting $68,572.65 for her time, and $17,871.86 for expenses paid.

## ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby **ORDERED** that judgment enter as follows:

1) Judgment shall enter in favor of Bob Murphy and Infosage Corporation against Melanie Cabot and Where to Park, Inc. for breach of fiduciary duty (Counts One and Two) and in favor of Infosage for tortuous interference with advantageous business relations (Infosage v. Cabot in Count Six). Damages shall be awarded to Murphy and Infosage against Cabot and Where to Park in the amount of $31,134.95.

2) Judgment shall enter in favor of Susan Bach against Melanie Cabot and Where To Park, Inc. for breach of fiduciary duty (Count One), fraud (Count Two), and breach of contract (Count Three). Damages shall be awarded to Bach against Cabot and Where To Park in the amount of $86,444.51.

This Court respectfully requests that the parties file a proposed form of final judgment within thirty days of the date of this Order.

Jeffrey A. Locke
Justice of the Superior Court

Dated:  March 29, 2018

-45-

Exhibit "A"

84

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION NO. 05-4042D

SUSAN BACH,         )
     Plaintiff,      )
                 )
                 )
v.                  )
                 )
MELANIE CABOT & WHERE TO )
PARK, INC.,         )
     Defendants    )

INFOSAGE CORPORATION   )
& BOB MURPHY,       )
     Intervening Plaintiffs )
                 )
v.                  )
                 )
MELANIE CABOT & WHERE TO )
PARK, INC.,         )
     Intervening Defendants )



## FINAL JUDGMENT

Pursuant to Mass. R. Civ. P. 58, it is Ordered and Adjusted as follows:

**Bob Murphy and Infosage Corporation's Complaint Against Melanie Cabot and
Where To Park, Inc.**

As to **Count One** (Breach of Fiduciary Duty) and **Count Two** (Breach of Fiduciary
Duty), judgment shall enter in favor of Bob Murphy and Infosage Corporation and
against Melanie Cabot and Where To Park, Inc. in the amount of **$31,134.95 with
prejudgment beginning on the date this suit was filed, September 22, 2005.**

As to **Count Six** (Tortious Interference With Advantageous Business Relations),
judgment shall enter in favor Infosage Corporation and against Melanie Cabot with no
additional damages beyond those awarded in Count One and Count Two.

JUDGMENT ENTERED ON DOCKET May 11, 20 19
PURSUANT TO THE PROVISIONS OF MASS. R. CIV. P.58(a)
AND NOTICE SEND TO PARTIES PURSUANT TO THE PRO-
VISIONS OF MASS. R. CIV. P. 77(d) AS FOLLOWS

Exhibit "B"

<u>**Susan Bach's Complaint Against Melanie Cabot**</u>

As to **Count One** (Breach of Fiduciary Duty) and **Count Two** (Fraud) and **Count Three** (Breach of Contract), judgment shall enter in favor of Susan Bach and against Melanie Cabot in the amount of **$86,444.51 with prejudgment beginning on the date this suit was filed, September 22, 2005.**

DATED: May 8, 2018

_(Locke, J.)_
Jeffrey A. Locke
Justice of the Superior Court

attest: Jane M. Mahon
asst. Clerk